# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JUSTIN BROWN AND TELISA LIPSCOMB, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | COMPLAINT – CLASS ACTION |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| DAIKIN AMERICA, INC., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |

## COMPLAINT

COME NOW Plaintiffs Justin Brown and Telisa Lipscomb (collectively, the "Named Plaintiffs") individually and as representatives of a class of participants and beneficiaries of the Daikin America, Inc. 401(k) Savings and Retirement Plan (the "Plan") and pursuant to 29 U.S.C. § 1132(a)(2) and (3) state their complaint against Defendant Daikin America, Inc. ("Daikin") for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, as amended, ("ERISA") 29 U.S.C. §§ 1001-1461:

## PRELIMINARY STATEMENT

1.      Today 26 U.S.C. § 401(k) defined contribution plans, where employees bear the risk of investment losses and must also pay investment management fees and the administrative expenses of the retirement plan, have become America's primary means of saving for retirement. This is the result of a gradual departure from the traditional defined

benefit pension plans, where the employer bears the risk of investments losses and pays the investment management fees and the cost of administering the plan.[1]

2.     The marketplace for services for defined contribution plans is established and competitive. Large plans, such as the Daikin plan, have the bargaining power to secure high quality, competitively-priced investment management services. As an ERISA fiduciary to the Plan, Defendant is obligated to act for the *exclusive* benefit of participants and beneficiaries in ensuring that Plan's investment management expenses are reasonable. 29 U.S.C. § 1104(a)(1). A fiduciary must discharge his responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  These duties are the "highest known to the law," which must be performed with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n. 8 (2d Cir. 1982) (*citing Restatement (Second) of Trusts,* § 2, comment b (1959) and *SEC v. Chenery Corp.*, 318 U.S. 80 (1943) (Frankfurter, J.).

## JURISDICTION AND VENUE

3.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

4.     This District and Division are the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district and division in which

---

[1] Nancy Trejos, "Retirement Wreck", Washington Post (Oct. 12, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/10/11/AR2008101100177.html.

the subject plan is administered, where at least one of the alleged breaches took place, and where at least one defendant may be found.

## PARTIES

### DAIKIN AMERICA, INC. 401(K) SAVINGS AND RETIREMENT PLAN

5.      The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).  The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a), which was amended and restated effective as of December 1, 2016.

6.      The Plan provides for the retirement savings and income of employees of Daikin and certain affiliates of the company that have been offered the Plan. The retirement savings and income of the employees participating in the Plan depends upon contributions made by or on behalf of each employee, deferrals of employee compensation and employer matching contributions, and from the performance of investment options, net of the investment management fees and administrative expenses charged to the participants.

7.      Daikin engaged John Hancock Trust Company, LLC, as successor-in-interest to New York Life Trust Company, to hold the assets of the Plan, as trustee, in accordance with 29 U.S.C. § 1103.  Daikin engaged John Hancock Retirement Plan Services, LLC, as successor-in-interest to New York Life Retirement Plan Services, LLC, to provide the recordkeeping and investment platform for the Plan.  The investment options selection by Daikin included a number of proprietary mutual funds that were advised by and which paid management fees to John Hancock Investment Management Services, LLC.  John Hancock Trust Company, LLC, John Hancock Retirement Plan Services, LLC, and John Hancock

Investment Managements Services, LLC all are subsidiaries of Manulife Financial Corporation ("MFC"), a publicly traded company based in Toronto, Canada, which does business as "John Hancock" in the U.S.

8.    As of December 31, 2016, the Plan had more than $100 million in assets and 576 participants with account balances.  The investment menu for the Plan has approximately 30 different investment options, of which as many as half a dozen were proprietary funds of John Hancock.

## NAMED PLAINTIFFS

9.    Plaintiff Justin Brown resides in Courtland, Alabama and was a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because he and his beneficiaries were eligible to receive benefits under the Plan.

10.    Plaintiff Telisa Lipscomb resides in Towncreek, Alabama and was a participant in the Plan under 29 U.S.C. § 1002(7) during the Class Period because she and her beneficiaries were eligible to receive benefits under the Plan.

## DEFENDANT

11.    Daikin, during the Class Period, was responsible for evaluating, monitoring, and replacing Plan investment options.

12.    Defendant Daikin America, Inc. is a corporation organized under the laws of New York with its principal place of business in Orangeburg, New York.  Daikin is the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and is a named fiduciary under the Plan and 29 U.S.C. § 1102(a).

4

13.     Prior to the initial filing of this Complaint, Plaintiffs Brown and Lipscomb requested information from the Plan Administrator pursuant to 29 U.S.C. § 1024.  Copies of the letters are attached hereto as collective **Exhibit A.**  More specifically, Plaintiffs requested Defendant to provide documentation that Defendant had a viable methodology for selecting, monitoring, and evaluating the fees and expenses associated with plan investments, investment options, and services.  Plaintiffs also requested documents identifying the fiduciaries responsible.  Despite its statutory obligation to respond to participant requests for information, Daikin America, Inc., as Plan Administrator, failed and refused to provide any information relating to Defendant's process for monitoring and evaluating fees.  Dakin America, Inc. also specifically omitted from the information provided the schedule to the Plan's trust agreement which identifies the fiduciaries responsible for selecting and monitoring the investments of the Plan.

14.     Consequently, Plaintiffs are not able to identify all of the persons that breached their fiduciary duties in the manner set forth herein.  Nor do Plaintiffs have access to all of the information to which they are entitled that would be necessary and desirable to provide additional factual support for the allegations made in this Complaint.

## FACTS APPLICABLE TO ALL COUNTS

15.     In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, net of costs assessed by the plan sponsor to such

account. *See* 29 U.S.C. § 1002(34).  Unlike defined benefit pension plans, the *participant*, not the plan sponsor, typically is responsible for paying the expenses of administering the plan.[2]

## PLAN STRUCTURE

16.     For each year of the Class Period, Daikin selected and arranged for the compensation of the investment managers and the administrative service providers of the Plan.

17.     Each year, Daikin chose the options for the investment menu from which participants were permitted to make selections for their individual retirement accounts. Although Daikin selected the investment menu, the employees participating in the Plan were responsible for the majority of the expenses, primarily investment management expenses, that resulted from Daikin's decisions.

18.     The investment management expenses were paid as part of the asset-based fees associated with the investment options. Such asset-based fees are usually referred to as the investment option's total annual operating expense or "expense ratio."  Expense ratios are deducted by the investment provider, typically a mutual fund, from the assets of each of the participants' investment options.  The expense rations, which were the single largest category of plan expenses, reduced the rate of return of the investments in the employee's retirement accounts.

19.     In addition to the investment options, Defendant also selected and arranged for the compensation of the custodian, recordkeeper, insurance provider, and the other

---

[2] A sponsor of a defined contribution plan may, but is not required to, pay for the expenses of administering the Plan and managing its investments.

vendors that provided administrative services to the Plan.  Daikin was responsible for monitoring the compensation of these service providers.

20.     Thus, although Daikin made decisions such as the selection of the investment menu and service providers for the Plan, Plaintiffs and the other participants in the Plan were responsible the consequences of these decisions.  To this extent, their financial health and well-being depended upon the quality of the decisions Daikin made in administering the Plan.  Plaintiffs and the other participants in the Plan paid a price in the form of excessive fees and lower investment returns when Daikin mismanaged the assets of the Plan in breach of its fiduciary duties of loyalty and prudence.

## STANDARD OF PRUDENT INVESTMENT

21.     ERISA requires a fiduciary to discharge his or her responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1).  Because ERISA's fiduciary duties are derived from the law of trusts, courts look to the law of trusts to determine the contours of an ERISA fiduciary's responsibility.  *Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015) (citing extensively and with approval *The Restatement (Third) of Trusts* § 90*; A. Hess, G. Bogert & G. Bogert, Law of Trusts and Trustees* § 684, 145–46 (3d ed. 2009 ["Bogert 3d"]; *4 A. Scott, W. Fratcher, & M. Ascher, Scott and Ascher on Trusts* § 19.3.1, p. 1439 (5th ed. 2007); and, *The Uniform Prudent Investor Act* § 2, Comment, 7B U.L.A. 21 (1995)).  Under trust law, the "prudent person" standard asks whether "the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.

1984) (*quoting Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983)), *cert. denied*, 464 U.S. 1040 (1984).

### Duty of Cost-Conscious Management

22.    Pursuant to the Restatement (Third) of Trusts, a trustee must exercise "cost-conscious management … not only in making investments but also in monitoring and reviewing investments." *Restatement (Third) of Trusts* § 90(c)(3). "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs." *Unif. Prudent Investor Act* § 7.

23.    It is beyond dispute that the higher the fees charged to a beneficiary the more the beneficiary's investment shrinks.  The magnitude of the effect that fees have on the financial performance of retirement accounts is far greater than many realize because of the effect of compounding.  The U.S. Department of Labor estimates that, over 35 years, a 1% difference in fees and expenses can reduce a participant's account balance at retirement by as much as 28%. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, 1-2 (Aug. 2013).[3]

24.    "Understanding and evaluating [retirement] plan fees and expenses associated with plan investments, investment options, and services is an important part of a fiduciary's responsibility." *Understanding Retirement Plan Fees and Expenses*, U.S. Department of Labor Employee Benefits Security Administration (December 2011).[4]

---

[3] This article is available at the following web address: http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

[4] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf

25.     The mutual fund industry is highly-competitive.  For large plans such as the

Daikin plan, there are thousands of high-quality mutual funds which broad market exposure,

low operating expenses and low portfolio turnover for every asset class in which a Plan such

as Daikin's plan is invested. Low-cost, high-quality funds providing exposure to asset classes

represented by all of the major benchmark indices are available at the touch of a keystroke

from major mutual fund providers, including, without limitation, Vanguard Investments

("Vanguard"), Fidelity Investments ("Fidelity"), Charles Schwab ("Schwab"), BlackRock,

Inc. ("BlackRock"), Pacific Investment Management Company, LLC ("PIMCO"), T. Rowe

Price, American Funds, TIAA-Cref, Dimensional Fund Advisors, and many others.

Information from these providers is available to every financial professional without any

need to scour the marketplace.  As an ERISA fiduciary, Daikin was required, under

principles of cost-conscious management, to take these readily available low-cost alternatives

into consideration in selecting the investment menu for the Plan.  Daikin also had to have a

reasonable, documented basis for excluding such funds from the investment lineup,

consistent with the trust law investment principles adopted by the U.S. Supreme Court in

*Tibble v. Edison International*, 135 S. Ct. 1823 (2015).

### High-Cost Investment Strategies

26.     Trust law prudent investment principles do allow the use of management

strategies that seek to beat the market, such as searching for advantageous segments of a

market, or for individual bargains in the form of underpriced securities.  *See* Comment h(2):

*Active strategies.*  Restatement (Third) of Trusts § 90 (2007).

27.     The great weight of authority, including the work of a series of winners of the Nobel Prize in economics, holds that strategies designed to outperform the market can be exceedingly difficult to implement successfully due to the higher costs involved.  William F. Sharpe, *The Arithmetic of Active Management*, 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991) ("Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."); Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010) ("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

28.     Even in cases where mutual fund managers claim to outperform the market in theory, the level of outperformance in practice most often does not justify the increased cost from the implementation of the fund manager's strategy.  Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; *see also* Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. FIN. 1655, 1690 (2000) ("on a net-return level, the funds underperform broad market indexes by one percent per year").

29.     There is little actual evidence, moreover, that when a fund beats the market during a particular time period, it does so as the result of the manager's skill as opposed to chance.  Studies show that a mutual fund that has outperformed the market in any prior time period is no more likely than other mutual funds to outperform the market in any future time period.  Laurent Barras *et al., False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. FIN. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund*

*Performance*, 52 J. FIN. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns").  On the other hand, the worst-performing mutual funds show a strong, persistent tendency to continue performing poorly. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

30.     Thus, although a prudent fiduciary is not forbidden from choosing a high-cost mutual fund that seeks to beat the market, a prudent fiduciary may not select higher-cost mutual funds unless the fiduciary has reasonably determined and documented that the fund is likely to outperform its benchmark index over time, net of investment expenses. Specifically, the decision to select and monitor actively managed funds involves judgments by the trustee: (a) that the gains from the course of action can reasonably be expected to compensate for the additional risks and costs; (b) that the investment is reasonable in terms of its economic rationale and role within the investment menu; and, (c) that there is a credible basis for concluding that the manager possesses or has access to the competence necessary to carry out the program.  *See*, *Restatement (Third)*, *supra*.

### Duty to Monitor

31.     The duty to monitor trust investments and to remove imprudent ones is a continuing obligation.  A trustee must "'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." *Tibble v. Edison*, 135 S. Ct. at 1829 (*quoting* Bogert 3d § 684, pp. 145–48.  "[A] trustee cannot assume that if investments are legal and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely." *Id.*

32.     "When the trust estate includes assets that are inappropriate as trust investments, the trustee is ordinarily under a duty to dispose of them within a reasonable time."  4 A. Scott, W. Fratcher, & M. Ascher, *Scott and Ascher on Trusts* § 19.3.1, p. 1439 (5th ed. 2007); Bogert 3d § 685, at 156–157 (explaining that if an investment is determined to be imprudent, the trustee "must dispose of it within a reasonable time").

**DAIKIN'S FAILURE TO MONITOR AND REMOVE
UNDERPERFORMING, HIGH-COSTS FUNDS**

33.     Daikin, as the sponsor of a large plan with access to professional investment advice, could easily have selected and retained for the Plan's investment menu competitively-priced investment options with acceptable performance compared to benchmark indices and investment alternatives without having to scour every corner of the marketplace.

34.     Instead, Daikin acted imprudently by selecting, failing to monitor, and retaining proprietary mutual funds affiliated with a party-in-interest to the Plan.  Daiken also acted imprudently by systematically excluding better performing low-cost benchmark fund alternatives from independent providers.

35.     The funds in question were MainStay funds sponsored by affiliates of John Hancock, as successor to New York Life Insurance Company.  John Hancock as plan recordkeeper already was involved in the day-to-day management of the investment platform, account management, participant and plan disclosures, enrollment, and other recordkeeping functions.  This gave John Hancock access to the Plans' decision-makers and the ability to influence, if not the right to insist upon, the use of mutual funds proprietary to John Hancock.  The investment management fees paid to John Hancock from proprietary mutual funds managed by John Hancock affiliates were not only substantial, but were

excessive by comparison to lower cost, better performing alternatives. Daikin, as plan sponsor, should have known that John Hancock had a strong financial incentive to market its own proprietary funds, even under circumstances where the management fees were excessive and despite the fact that the funds underperformed both their benchmarks and low-cost benchmark fund alternatives. Recognizing this conflict of interest, Daikin should as part of a prudent process have flagged these funds for evaluation and removed the funds from the Plan.

36. The funds that Daikin selected, then failed to adequately monitor, included the following funds:

      a.   MainStay S&P 500 (MSXAX);

      b.   JHTC Mainstay ICAP Select Equity I (ICSLX);

      c.   JHTC Mainstay Large Cap Growth R2 (MLRTX);

      d.   JHTC Mainstay MAP Fund I (MUBFX);

      e.   JHTC Mainstay Balanced Fund I (MBAIX); and,

      f.   MainStay High Yield Corporate Bond A (MHCAX).

37. Daikin's process for evaluating and monitoring these funds was deficient in a number of respects:

      a.   Daikin failed to adequately monitor the stewardship of the parent company for the MainStay funds which had a prior record of mismanaging funds – including index funds – with excessive fees;

      b.   Daikin failed to adequately monitor the investment advisors to the MainStay funds one of which was ultimately terminated for poor performance;

c.      Daikin failed to adequately monitor the expense ratios of the MainStay funds which were excessive compared to peer funds and lower-cost benchmark fund alternatives;

d.      Daikin failed to monitor the turnover and resulting market impact and brokerage costs of the MainStay funds not included in the expense ratio;

e.      Daikin failed to monitor the flow of money into and out of the funds indicating the market's lack of confidence in the funds;

f.      Daikin failed to monitor the risk/return characteristics of the funds;

g.      Daikin failed to monitor the performance of the funds compared to the benchmark indices and low-cost alternative fund benchmarks; and,

h.      Daikin failed to monitor the share classes of the funds.

### MainStay S&P 500 Fund

38.     The most significant equity option in the Plan during the Class Period was the MainStay S&P 500 Index Fund (MSXAX).  The Plan's total investment in this fund ranged from $7.7 million in 2012 to $19.6 million in 2017.

39.     Daikin should, in evaluating the merits of the MainStay fund, have flagged the management of the mutual fund for further review.  The investment manager for the funds – an affiliate of John Hancock, as successor to New York Life, the Plan's recordkeeper and investment platform provider – had been sanctioned by regulatory authorities for alleged failures of corporate governance in managing the fees and expenses of another similar MainStay S&P 500 equity index mutual fund.  *See* Nathan Hale, Money Watch, *MainStay Equity Index Fund: A Failure of Mutual Fund Governance* (July 7, 2009).  In 2009, the U.S.

14

Securities and Exchange Commission settled charges with New York Life, the parent company of the MainStay fund, for violations of the "anti-fraud" provisions of the Investment Company Act. The violations related to an S&P 500 index fund, the MainStay Equity Index Fund, with a performance guarantee the value of which New York Life Investment Management, LLC misrepresented and that had excessive fees. The consent order made part of the public record required MainStay to refund the excessive fees charged to the fund. *See SEC v. New York Life Investment Management, LLC*, File No. 3-12487 (May 27, 2009). Had Daikin done the due diligence required of a prudent fiduciary Daikin would have known that the MainStay fund in Daikin's investment menu, which also included an S&P 500 index fund, were managed by the same investment management company. A fiduciary that flagged the fund for review soon would have discovered not only that the fees MainStay S&P 500 index fund were grossly excessive, but that MainStay had a prior record of mismanaging such funds.

40. The MSXAX, which represented the most significant equity holding in the Daikin Plan, had an expense ratio of 0.60%, meaning that the fund charged participants a management fee of $6 per $1000 invested per year.

41. The investment objective of an S&P 500 fund, as the name suggests, is to match the S&P 500 Index (SPXT). S&P 500 Index funds such as this are one of the most common varieties of mutual funds, which can be obtained at competitive costs from any number of mutual fund providers such as Fidelity, Schwab, Vanguard, and TIAA-Cref, among many others.

42.     The primary and, in most cases, only material factor distinguishing S&P Index funds are operating costs, and providers of S&P Index funds compete with each other on the basis of cost.

43.     As Daikin would immediately have discovered had Daikin conducted acceptable due diligence, a reasonable expense ratio for an S&P 500 Index fund, for an institutional investor, ranges between 0.02% and .15% -- that is, 20 cents to $1.50 per $1000.

44.     The expense ratio of MSXAX, from 2012 to 2016, was more than *10 to 30 times* the cost of funds that were identical if not superior to MSXAX in all material respects. The fees of *this particular MainStay fund* have, by various different news organizations, been described as *"obscene." See, e.g.* Gary Brooks, CPF, *Don't pay obscene fees for index funds*, BrightScope Article;[5] *see also* Joe Light, *Don't Pay High Fees for Index Funds*, THE WALL STREET JOURNAL (May 13, 2013) (quoting financial advisor describing the practice as "embarrassing" observing that, "Some investors are really getting ripped off, without a doubt.").[6]

45.     One need not scour the marketplace to identify a fund that outperforms MSXAX, nor are the defects apparent only with the benefit of hindsight.  The MSXAX S&P

---

[5] The italcs are added. The use of the word "obscene" to describe the cost of this fund is in the original article, which may be found at:

https://www.brightscope.com/financial-planning/advice/article/29867/Dont-Pay-Obscene-Fees-For-Index-Funds/

[6] The same WSJ article also quotes a Yale University finance professor saying, "I guess in any market where there are fools, it's profitable to make a bad product and pick up a few." This article is available at:

https://www.wsj.com/articles/SB10001424127887324582004578457093069337584

500 index fund, at this price, has and always will underperform any reasonably priced S&P 500 fund as a matter of simple arithmetic.

46.     Here, the Plan lost money on this investment, month after month, compared to the benchmark and peer funds.  The following chart illustrates the cumulative comparative impact from differential fund expenses for MSXAX and a generic, low-cost S&P 500 index fund by TIA-CREFF (TISPX), with an expense ratio of approximately 0.04%, from MSXAX's inception in 2004 to the present:



(Data: Bloomberg; Analysis: Comparison to Benchmark; Scale: 0.92-1.00).[7]  The blue/top line in this chart represents the relatively small amount of money lost to fees by the low-cost fund (TISPX) compared to the S&P 500 Index (SPXT).  The black/bottom line represents the much larger amount of money wasted on fees by the high-cost fund (MSXAX) selected by Daikin for the Plan's investment menu, compared to the S&P 500 Index (SPXT).

47.     The MainStay 500 Fund compared to its benchmark (SPXT) and low-cost alternative (TISPX) underperformed each year, year after year, over the entire life of the fund:

---

[7] Except as otherwise indicated, the source of the financial information – the raw data – used in the preparation of the charts and tables in this complaint is Bloomberg, Total Return Index (Gross Dividends, Monthly).

Annual Returns (%)

| | MainStay S&P 500 Index A | TIAA-CREF S&P 500 Index | S&P 500 Index |
|---|---|---|---|
| 2004 | 8.30 | 8.76 | 8.88 |
| 2005 | 4.13 | 4.85 | 4.91 |
| 2006 | 15.13 | 15.71 | 15.79 |
| 2007 | 4.88 | 5.42 | 5.49 |
| 2008 | -37.22 | -37.03 | -37.00 |
| 2009 | 25.73 | 26.51 | 26.46 |
| 2010 | 14.36 | 14.97 | 15.06 |
| 2011 | 1.57 | 2.03 | 2.11 |
| 2012 | 15.33 | 15.93 | 16.00 |
| 2013 | 31.63 | 32.26 | 32.39 |
| 2014 | 12.99 | 13.59 | 13.69 |
| 2015 | 0.81 | 1.30 | 1.38 |
| 2016 | 11.32 | 11.88 | 11.96 |
| 2017 | 21.13 | 21.72 | 21.83 |
| 2018 | 1.79 | 1.98 | 2.02 |

(Data: Bloomberg; Analysis: Calendar Returns).

48.      The drag on returns over time due to excessive fees during the life of an investment in a typical retirement plan is substantial.  The following table compares the performance of MSXAX to the generic, low-cost index fund TISPX, from MSXAX's inception date to the present.  Thus, a plan with $10 million invested in MSXAX at its inception on February 2, 2004 would have $19.6 million in today's dollars as of September 1, 2018, with the amount of $2.5 million lost to fees.

19

Period: 2004-02-01/2018-09-01

|  | Cumulative Return (%) |
| --- | --- |
| TISPX | 196.33 |
| S&P 500 Index | 221.78 |
| Effect of Fees | -25.44 |

A plan with $10 million invested in a generic, low-cost index fund – such as the TIAA-Cref S&P 500 Index Fund (TISPX) would have $22.1 million, with the amount of $323,000 lost to fees.

Period: 2004-02-01/2018-09-01

|  | Cumulative Return (%) |
| --- | --- |
| TISPX | 218.54 |
| S&P 500 Index | 221.78 |
| Effect of Fees | -3.23 |

The $2.2 million difference is the result of the excessive management fees paid to John Hancock. This is *why fees matter*.

49.     Unlike the participants in the broader marketplace, the participants in the Daikin plan had only one S&P 500 fund to choose from, the MainStay S&P 500 (MSXAX). To take advantage of the S&P 500, a well-known and widely held retirement investment option, even financially savvy participants had no choice but to pay these excessive fees. *See Don't pay obscene fees for index funds, supra* (noting that the average American may pay too much because he or she is limited to the choices in his or her employer's retirement plan).

50.     Under these circumstances, Daikin had no reasonable basis for excluding other lower-cost alternative -- such as VINIX (Vanguard) [0.035%]; FSIFC (Fidelity) [0.03%]; TISPX (TIAA-Cref) [0.05%]; SWTSX (Schwab) [0.03%]; or WFSPX (BlackRock)

20

[0.04%] – which would have provided exposure to the same asset class without unnecessarily wasting participants' assets on fees.

51.     News articles suggest that the flow of funds into investments such as this are "due to lack of financial literacy." *See, e.g.*, Gary Brooks, *Slashing your fund fees*, USA Today, June 20, 2015.[8]  In this case, the Plan's investment was the result of the failure of the Plan fiduciary to exercise prudence in monitoring the fees of the funds in the Plan's investment menu.

### Mainstay ICAP Equity Select

52.     Daikin also breached its duty of prudence and loyalty by its failure to monitor and to remove from the plan menu another proprietary mutual fund, the MainStay I Cap Equity Fund (ICSLX). The Plan's investment in ICSLX ranged from $2.7 million in 2012 to $3.2 million in 2015.

53.     The MainStay ICAP Equity Fund (ICSLX) fund is a proprietary fund of the recordkeeper to the Daikin plan – John Hancock, as successor to New York Life – which John Hancock had an incentive to sell to the Plan, whether the fund performed well or not. A prudent fiduciary, recognizing the conflict of interest, would have paid careful attention to the performance of the fund.

54.     The fund had an expense ratio of 0.90%, which is *more than 10 times the expense ratio of any reasonable low-cost fund benchmark*, and also a significant turnover ratio, which added

---

[8] This article is available at:

https://www.usatoday.com/story/money/personalfinance/2015/06/20/adviceiq-slash-fund-fees/28733535/

to the overall cost of the fund.  Under principles of best net cost execution, a fiduciary to the plan would not only need to be qualified to evaluate the fund but would also need to determine and document that the performance compared to the benchmark and passive alternatives, would justify such a high cost.

55.     The fund originally designated in its prospectus the S&P 500 index as its primary benchmark.  As part of its investment process, the fund focused on value, dividends, and key variables in picking a portfolio of stocks that the fund believed would beat the market.  In other words, the fund was a stock-picking type fund.

56.     Had Daikin implemented a prudent process for the monitoring and evaluation of the fund, Daikin would have flagged the fund for further review as a result of changes in the management of the fund.  The fund portfolio manager and founder of the Institutional Capital, LLC ("ICAP") management company, Robert Lyon, was considered a capable fund manager, but he died suddenly in 2007 at the age of 57.  The fund was then sold to New York Life, although ICAP continued to manage the fund for New York Life as sub-advisor.

57.     After the sale to New York Life, the fund which had touted its ability to consistently outperform the S&P 500 consistently failed to even match, much less outperform its benchmark indices as necessary to justify its high fees.[9]  The fund underperformed the S&P 500 benchmark; then, after switching to the Russell 1000 benchmark, underperformed the Russell 1000 as well.  The fund demonstrated no ability to achieve the "consistent outperformance" necessary to justify its high cost.  The fund's

---

[9] *Chicago-based Institutional Capital loses mutual fund business,* Gail MarksJarvis, CHICAGO TRIBUNE (Jan. 12, 2017). Reference to analyst reports are from Morningstar, Inc. a leading source of information about mutual funds.

consistent underperformance is clearly shown in the following chart, which compares the

performance of the fund to its benchmark index prior to and during the Class Period:



(Data: Bloomberg; Analysis: Annualized Returns).  The same information in tabular form is

as follows:

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| MainStay ICAP Equity Fund Class A | 17.71 | -1.74 | 15.35 | 29.81 | 8.65 | -3.98 | 3.67 |
| Vanguard 500 Index Admiral | 15.05 | 2.09 | 15.97 | 32.33 | 13.64 | 1.36 | 11.93 |
| Excess Return | 2.66 | -3.83 | -0.62 | -2.52 | -4.99 | -5.34 | -8.26 |

(Data: Bloomberg; Analysis: Calendar Returns).  The performance of the fund also was

inferior to the performance of the benchmark and to lower cost benchmark fund

alternatives, such as the Vanguard 500 Index Admiral (VFAIX), over 3-, 5-, and 10- year

periods:

Period: 2008-01-01/2018-09-01

|  | 3-Year Annualized Return (%) | 5-Year Annualized Return (%) | 10-Year Annualized Return (%) | Inception Date |
|---|---|---|---|---|
| MainStay ICAP Equity Fund Class A | 4.02 | 11.28 | 5.03 | Jan. 01, 1998 |
| Russell 1000 Value Index | 12.32 | 11.22 | 8.93 | Feb. 01, 1979 |
| Vanguard 500 Index Admiral | 16.07 | 14.48 | 10.85 | Dec. 01, 2000 |

(Data: Bloomberg; Analysis: Annualized Returns).  The Vanguard 500 Index Admiral (VFAIX) is one of many funds with highly correlated holdings and returns that provides an appropriate low-cost benchmark fund alternative.  A fiduciary with a prudent process would, without the benefit of hindsight, have identified the MainStay fund as underperforming, net of fees, compared to both its benchmark index and to lower cost benchmark fund alternatives, and would have removed the fund from the Plan.

58.     Daikin also failed to monitor the flow of funds into and out of the fund, indicating the market's confidence, or lack thereof, in the performance of the fund.  Had Daikin implemented such a prudent process, Daikin would have known from reports filed by the fund with the SEC, that the fund was experiencing a significant loss of assets, demonstrating the market's lack of confidence in the fund.  Following chart, summarizing SEC data, indicates that there was a substantial flow or money out of the fund in 2014 and 2015.

24



(Source: Brightscope). In 2016 alone, there was a $1.49 billion flow of investments out of the

fund.

59.    In 2017, as a result of this poor performance, the fund's board terminated its

business relationship with the fund manager ICAP and transferred the assets of the funds to

a new fund manager. In SEC filings, it was disclosed that:

> In recent years, the Acquired Funds [MainStay ICAP Equity and Select Equity Funds]
> have both experienced performance challenges. New York Life Investments worked
> with the prior subadvisor of the funds, ICAP, to address these performance
> challenges; however, despite these efforts, the Equity and Select Equity Funds'
> performance did not sufficiently or consistently improve. As a result, on January 6,
> 2017, the Board approved the termination of each Acquired Fund's subadvisory
> agreement with ICAP and approved an Interim Subadvisory Agreement between the
> Acquired Funds and Epoch, which took effect on January 9, 2017

Form N-14 Registration Statement, ICSLX, MainStay Funds Trust (Feb. 27. 2017) at p. 2

(emphasis added).  The filing also states that the funds would benefit from "lower

management fees and net operating expenses." *Id.*

60.     Under these circumstances, Daikin had no reasonable basis for excluding a low-cost alternative – such as VFAIX (Vanguard) [0.04%], Fidelity (FXAIX) [0.02%], Schwab (SWPPX) [0.03%] , or BlackRock (WFSPX) [0.04%] – which would have provided exposure to the same asset class without wasting participants' assets.

61.     The Plan also eventually terminated its position in this fund, but not before unnecessarily wasting a participants' money by paying the underperforming funds' excessive fees for most of the Class Period.

## MainStay Map I Fund

62.     Daikin also breached its duties of prudence and loyalty in failing to monitor and to remove from the Plan menu a third proprietary mutual fund, the MainStay MAP I Fund (MUBFX).  The Plan's investment in MUBFX ranged from $1 million in 2012 to $3.2 million in 2015.

63.     Like the MainStay ICAP Equity Fund, the MainStay MAP I (MUBFX) fund also is a proprietary fund of John Hancock, a party-in-interest whose compensation Defendant had a duty to monitor. Like ICSLX, MUBFX originally was an ICAP fund, which experienced the same difficulties as the other ICAP funds following the death of its manager and sale to New York Life.

64.     As with the other MainStay Funds, the expenses of the MainStay MAP I Fund were high compared to peer funds.  The fund had an expense ratio ranging from .89% in 2012 to .86% in 2016, *more than 20 times that of a reasonable low-cost benchmark alternative*.  Under principles of best net cost execution, a fiduciary to the plan would not only need to be qualified to evaluate the fund, but would also need to determine and document, that the

26

performance, compared to the benchmark and the lower-cost benchmark fund alternatives, would justify such a high cost.

65.     The fund designated, in its prospectus, the Russell 3000 index as its primary benchmark.  The fund's investment strategy was to select stocks undervalued by the market. As with the other ICAP funds, the MainStay MAP I experienced a history of poor performance, following the death of its principal manager in 2007, ultimately resulting in the termination by MainStay of its relationship with ICAP. *See*, *e.g.,* Schedule 14A Proxy Statement, MUBFX, The MainStay Funds (January 27, 2017).

66.     Over the class period, the fund consistently underperformed the Russell 3000 benchmark, failing to demonstrate an ability to achieve its stated goal of beating the benchmark. This is clearly shown in the following chart, which compares the performance of the fund to its benchmark index during the Class Period:



(Data: Bloomberg; Analysis: Annualized Returns).  The supporting data in tabular form is:

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MUBFX | -37.12 | 30.32 | 15.61 | -2.00 | 16.23 | 31.02 | 9.00 | -2.77 | 8.51 | 22.77 | 5.61 |
| Russell 3000 Index | -37.31 | 28.34 | 16.93 | 1.03 | 16.42 | 33.55 | 12.56 | 0.48 | 12.74 | 21.13 | 6.64 |
| Excess Return | 0.19 | 1.98 | -1.32 | -3.03 | -0.19 | -2.53 | -3.56 | -3.25 | -4.23 | 1.64 | -1.03 |

(Data: Bloomberg; Analysis: Calendar Returns).  The performance of the fund also was inferior to the performance of both the benchmark index and to comparable low-cost benchmark fund alternatives, such as the Vanguard Mega Cap Index Institutional (VMCTX), over 3-, 5-, and 10- year periods:

Period: 2006-01-01/2016-01-01

|  | 3-Year Annualized Return (%) | 5-Year Annualized Return (%) | 10-Year Annualized Return (%) | Inception Date |
|---|---|---|---|---|
| MainStay MAP Equity Fund | 11.56 | 9.60 | 6.34 | Dec. 01, 1986 |
| Vanguard Mega Capital Index Institutional | 15.00 | 12.57 | 6.41 | Jan. 01, 2008 |
| Russell 3000 Index | 14.74 | 12.18 | 7.35 | Feb. 01, 2005 |

(Data: Bloomberg; Analysis: 3-,5-, and 10- Year Annualized Returns).  Vanguard Mega Capital Index Institutional (VMCTX) is one of many funds, with highly correlated holdings and returns, that provide an appropriate low-cost benchmark fund alternative.

67.    The fund's performance during the Class Period is demonstrated by the following chart:



(Data: Bloomberg; Analysis: Cumulative Returns).  The performance of the fund represented by the black/bottom line is inferior to the performance of the benchmark index and passive fund alternative represented by the blue/green/ top lines.  Labelling the fund's performance poor is accurate, if understated.

68.     As with the ICAP fund, reports filed with the SEC indicate a massive exodus of assets from the fund during the class period.  Such information would have been readily available to a fiduciary monitoring the fund and should have prompted, at the very least, a re-evaluation of the fund.

69.     Under these circumstances, Daikin had no reasonable basis for excluding low-cost alternatives – such as VMCTX (Vanguard) [0.06%], TISPX (TIAA-Cref) [0.6%], DFSIX (DFA) [0.25%], or Schwab (SWPPX) [0.03%] – which would have provided exposure to the same asset class without wasting participants' retirement savings on excessive fees.

**MainStay Large Cap Growth R2**

70.     Defendant also selected and maintained an investment in yet another overpriced and underperforming MainStay fund, the MainStay Large Cap Growth R2 Fund (MLRTX).  The Plan's investment in MLRTX ranged, during the class period, from $5 million to $ million.

71.     Like the other MainStay funds, MLRTX fund is a proprietary fund of John Hancock, a party-in-interest to the Plan whose compensation Defendant had a duty to monitor and disclose.  Morningstar analysts have expressed little confidence in the management of the fund, stating "we lack confidence in the fund's investment process and execution.  The current iteration of the fund's management team has yet to prove its worth."[10]

72.     The fund designated, in its prospectus, the Russell 1000 Growth Index as its primary benchmark index.  The fund's strategy focuses on picking winners based upon company specific, as opposed to general economic, factors.  The fund also has a relatively high turnover ratio of approximately 60%.

73.     The fund had an expense ratio ranging from 1.17% in 2012 to 1.07% in 2016, *three to four times the cost of a reasonable low-cost benchmark alternative* such as the Vanguard Primecap Index Fund Admiral Shares, which had an expense ratio of about 0.32%.  As noted by analysts, "the price risk associated with chasing winners is hard to ignore in market pullbacks, especially as it's unclear whether the current team can execute as well as its predecessors."

---

[10] Morningstar, Analyst Report, Shannon Yan (May 18, 2018).

74.     The fund demonstrated no ability to outperform the Russell 1000 benchmark, during or prior to the class period.  This is clearly shown in the following chart, which compares the performance of the fund to its benchmark index:



(Data: Bloomberg; Analysis: Comparison to Benchmark).

75.     The supporting data in tabular form is as follows:

|  | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| MainStay Large Cap Growth Fund R2 | 25.83 | 4.44 | 10.76 | 26.50 | 11.66 | -1.61 | 11.82 | 37.96 | 10.29 |
| Russell 1000 Growth Index | 25.14 | 6.07 | 13.43 | 24.35 | 14.59 | 1.32 | 17.23 | 34.89 | 8.74 |
| Excess Return | 0.69 | -1.63 | -2.67 | 2.15 | -2.93 | -2.93 | -5.41 | 3.07 | 1.55 |

(Data: Bloomberg; Analysis: Calendar Returns).

76.     Under these circumstances, Daikin had no reasonable basis for excluding low-cost alternatives – such as VPMAX (Vanguard) [0.32%], TILIX (TIAA-CREF) [0.06%], IWF (iShares) [0.20%], VRGWX (Vanguard) [0.08%], or SPYG (SPDR) [0.04%] – which

would have provided exposure to the same asset class without wasting participants' assets on fees.

77.    For example, the performance of the fund is inferior to the performance of a comparable passive alternatives, such as the Vanguard PRIMECAP Fund Admiral Shares (VPMAX), over 3-, 5-, and 10- year periods:

Period: 2008-01-01/2018-01-01

| | 3-Year Annualized Return (%) | 5-Year Annualized Return (%) | 10-Year Annualized Return (%) | Inception Date |
|---|---|---|---|---|
| MainStay Large Cap Growth Fund R2 | 14.92 | 16.48 | 10.56 | Apr. 01, 2005 |
| Vanguard PRIMECAP Admiral Shares | 16.91 | 19.61 | 12.35 | Nov. 01, 2001 |
| Russell 1000 Growth Index | 17.01 | 17.95 | 11.65 | Dec. 01, 1978 |

(Data: Bloomberg; Analysis: 3-, 5-, and 10- Year Returns).  Vanguard PRIMECAP Admiral Shares (VPMAX) is one of many funds with highly correlated holdings and returns, that provide an appropriate low-cost benchmark fund alternative.

78.    Daikin also failed to adequately monitor the risk/return characteristics of the fund. According to Morningstar analysts, the performance of the fund "hasn't been convincing" on a risk adjusted basis.  Taken in context, this means that any additional returns generated by the fund were outweighed by the additional risk.  The fund's alpha – the most common measure of risk adjusted performance – was, on average, negative during the entire class period:



(Data: Bloomberg; Analysis: 5-Year Rolling Alpha).  A plan fiduciary would have been able to identify the lag in performance, without the benefit of hindsight, as demonstrated by the 5-year rolling average.

79.     As with the other MainStay funds, reports filed with the SEC indicate a massive exodus of assets from the fund, during the class period.   Such information would have been readily available to a fiduciary monitoring the fund.

**MainStay Balanced Fund**

80.     Defendant also selected and maintained an investment in yet another overpriced and underperforming MainStay fund, the MainStay Balanced Fund (MBAIX).  The Plan's investment in MBAIX ranged, during the Class Period, from $4 million to $6 million.

81.     The MainStay Balanced fund invests approximately 60% of its assets in stock and 40% in fixed-income securities.  The fund chose the Russell Midcap Value Index and the Bank of America Merrill Lynch 1-10 Year U.S. Corporate Government Index as its benchmark indices.

82.     The fund had an expense ratio of 0.90% during the class period, which nearly five times the cost of a comparable passive alternative such as the Vanguard Primecap Index Fund Admiral Shares, which had an expense ratio of about 0.32%, and which attempts to beat its index by picking winners and losers.

83.     Daikin, as part of a prudent process, also should have flagged the fund for further review based on cost factors other than the expense ratio.  This fund, in particular, had a turnover ratio of 150% to 200% of the average value of its portfolio, which is exceedingly high.  A high turnover ratio such as this would greatly have increased the trading costs of managing the funds.  This factor alone should would have caused a prudent fiduciary to flag the fund and to remove it from the Plan upon determining that the returns did not justify the additional costs.

84.     The fund, according to its own prospectuses, has demonstrated no ability to outperform its benchmark index, before or during the Class Period, and the performance of the fund also was inferior to the performance of lower cost alternatives, such as the Vanguard Balanced Index Fund (VBAIX), over 3-, 5-, and 10- year periods:

Period: 2008-01-01/2018-01-01

| | 3-Year Annualized Return (%) | 5-Year Annualized Return (%) | 10-Year Annualized Return (%) | Inception Date |
|---|---|---|---|---|
| MainStay Balanced I | 5.59 | 9.69 | 6.70 | Jun. 01, 1989 |
| Vanguard Balanced Index Fund | 7.59 | 10.10 | 7.16 | Dec. 01, 2000 |

(Data: Bloomberg; Analysis: 3-, 5-, and 10- Year Returns).  Vanguard Balanced Index Fund (VBAIX) is an appropriate low-cost benchmark fund alternative, with highly correlated holdings and returns.  There also has been a substantial flow of money out of the MainStay fund over the past decade.

85.     Under these circumstances, Daikin had no reasonable basis for excluding low-cost benchmark fund alternatives – such as VBAIX (Vanguard) [0.06%] – which would have provided exposure to the same asset class without wasting participants' retirement savings on excessive fees.

**Fees Wasted on MainStay Funds**

86.     A fiduciary with a prudent process would, without the benefit of hindsight, have flagged each of the MainStay funds for review based on the parent company's stewardship and conflicts of interest, high fees and high turnover, and recent history of poor relative performance. A fiduciary with a prudent process would also have recognized that the management fees of each of the funds were substantially in excess of the peer medians.  A prudent fiduciary would have documented the reasons for and basis of its decision and removed the funds from the Plan.

35

87.     Daikin, upon request by Plan participants, failed to produce any evidence that Daikin had such a prudent process.

88.     The cost to the plan of the money wasted on the MainStay funds was:

| Fund Name | Lower Cost Alternative | Fund Expense Ratio | Alternative Expense Ratio | Fund Assets (2012-2018) | High-Cost Fee Waste |
|---|---|---|---|---|---|
| Mainstay ICAP Select Equity I (ICSLX) | VFAIX | 0.90% | 0.18% | $ 15,572,262 | $ 118,870 |
| Mainstay Large Cap Growth R2 (MLRTX) | VPMAX | 1.13% | 0.35% | $ 55,793,471 | $ 425,976 |
| Mainstay S&P 500 Index Fund A (MSXAX) | FUSEX | 0.59% | 0.06% | $ 101,201,703 | $ 527,609 |
| Mainstay MAP Fund I  (MUBFX) | VMCTX | 0.88% | 0.08% | $ 9,485,201 | $ 75,719 |
| MainStay Balanced Fund I (MBAIX) | VBAIX | 0.92% | 0.07% | $ 30,221,701 | $ 255,306 |
| Mainstay High Yield (MHCAX) | VWEHX | 1.00% | 0.23% | $ 7,869,022 | $ 60,569 |
| | | | Total | $ 220,143,360 | $ 1,464,049 |

89.     This amount does not include the lost investment opportunity – that is, the money that the portion of the investment spent on unnecessary fees would have earned over time. Nor does it include the fees and expenses associated with high-turnover, which are not reported as part of the mutual fund's expense ratio, but which reduce the overall fund returns.

## FAILURE TO MONITOR FUND SHARE CLASSES

90.     It is a general principle of investment management that the larger the size of an investor's available assets, the lower the investment management fees – expressed as a percentage of the amount invested or "expense ratio" that can be obtained in the market. The fixed costs of operating a mutual fund decrease as a percentage of assets as the assets under management increase.  The cost of managing investments for a single institutional investor, such as a retirement plan, is substantially less than the cost of managing the same investments for multiple individual retail investors.  Thus, large retirement plans have substantial bargaining power to negotiate lower management fees for the same investment

36

products.  A large plan with a viable methodology will be able to easily identify the share classes with lower expenses, which are publicly disclosed by the SEC in its online EDGAR mutual fund database.  In this instance, Daikin, despite having access to professional advice and the responsibility to manage a $100 million retirement plan, has repeatedly failed to invest in the lower cost share classes available to it in order to properly reduce fees and costs associated with fund management, thus breaching its fiduciary duty to the Plan and its participants.

91.     The two most common types of mutual funds are retail funds and institutional funds. Retail class shares are available to a broad spectrum of investors, including individuals, while institutional class shares are typically only sold to larger investors, including 401(k) plans.  The Department of Labor has advised that "[i]nstitutional mutual funds typically charge lower expense ratios than do the retail funds with similar holdings and risk characteristics.  One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds."  *U.S. Dep't of Labor Pension & Welfare Ben. Admin., Study of 401(k) Plan Fees and Expenses* § 2.4.1.3 (Apr. 13, 1998).

92.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs, such as different fee and "load" (*i.e.* sales) charges.  All share classes of mutual funds charge fees for investment management - for the management of the assets of the fund.  The cost may differ, but the investment product is identical.  The managers, investment styles, and stocks are not merely similar, but identical.

93.     These share classes of mutual funds differ in terms of the non-investment management related costs.  The expenses of a typical mutual fund consist of (1) Shareholder Fees; and, (2) the Expense Ratio.

94.     Shareholder fees consist of fees such as sales loads, redemption fees, exchange fees and account fees.  Retirements plans, however, have access to retirement account share classes, referred to as "Institutional Class" or "R Class" shares.  Institutional / R Class shares typically have lower expense ratios than retail class shares because retirement plans can meet the minimum investment requirements of the lower cost institutional funds.

95.     There also are significant differences in the expense ratios between and among the institutional share classes to which retirement plans have access.  These differences typically appear in the mutual fund prospectus descriptions, "Annual Fund Operating Expenses," which include the following:

a. ***Investment management fees:*** fees paid out of the fund assets to the investment advisor for portfolio management and administrative expenses;

b. ***Distribution [and/or Service] 12(b)-1:*** fees for payments to brokers for the sale of funds and for ongoing services of the account or plan; and,

c. ***Other expenses***: mutual fund expense ratios often include "other expenses," including legal, accounting, and other administrative expenses.

96.     The Annual Fund Operating Expenses often are different for different classes of shares, depending on the type of distribution, 12(b)-1, and other fees included in the expense ratio.  A fiduciary must understand the difference and implement a prudent process for selecting the appropriate share class for the Plan.

97.     Retirement plans such as the Daikin Plan can and should, with the assistance of a financial advisor, monitor and take advantage of volume discounts in purchasing mutual fund shares.  Low-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors such as Daikin, which can easily meet minimum investment amounts for these share classes.  A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan.

98.     Mutual funds, moreover, are not static, and share classes change over time, as lower share classes are issued.  For example, a plan may invest in an Advisor share class, the lowest class available at that time, only to find, upon reading the prospectus of the mutual fund, that an Institutional class has become available, at a lower expense ratio, for the same mutual fund.  A fiduciary with a prudent methodology will monitor and evaluate the share classes of the available mutual funds and have established a process to move the Plan's assets into lower cost share classes as they become available.

99.     A manager of a $100 million retirement plan with a viable methodology to choose investment options would have discovered the lower priced share classes as soon as they became available.  Fiduciaries to retirement plans are held to the standard of a professional investment advisor, whether the work is performed in-house or delegated to an

outside advisor.  As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[1]  This is precisely what happened at Daikin, where Daikin repeatedly breached its duty of prudence by failing to monitor and select the lowest cost share class investment options.

100.    In this case, the fiduciaries to the Plan wasted the assets of the Plan by failing to monitor the available share classes and selecting the lowest share class of the funds for inclusion in the plan menu.  Time after time, the Plans selected the higher-cost share class, while a lower cost share class was available with the same underlying securities.  This failure continued from the beginning of the class period until the present.

101.    The mutual funds for which Plaintiffs cannot currently determine the share class utilized also may have offered lower-cost share classes which would have been available to the Plan.

102.    In this case, Daikin failed to select the lowest share class – that is, overpaid – for the following funds at a total cost to the Plan, over the class period, in excess of.  The following table summarizes the loss to the Plan by fund provider:

---

[1] "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at:

https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-share-class-initiative.pdf

| Fund Name / Class | Fund Symbol | Fund Exp. Ratio | Alternative Symbol | Alternative Exp. Ratio | Excess Cost | Assets (2012 - 2018) | Total Fee Waste |
|---|---|---|---|---|---|---|---|
| Cohen & Steers | CSRSX | 0.98% | ICF | 0.35% | 180.00% | $ 8,789,690 | $ 54,824 |
| T. Rowe Price Small-Capital Stock Advisor | PASSX | 1.18% | TRSSX | 0.68% | 73.53% | $ 18,259,604 | $ 91,411 |
| Oppenheimer Developing Markets A | ODMAX | 1.32% | ODVIX | 0.87% | 51.72% | $ 3,710,585 | $ 16,730 |
| Harbor International Fund Inv | HIINX | 1.13% | HAINX | 0.73% | 54.79% | $ 8,725,316 | $ 36,005 |
| Neuberger Berman Mid Capital Growth A | NMGAX | 1.12% | NBMLX | 0.68% | 64.71% | $ 63,478,667 | $ 278,832 |
| Mainstay MAP Fund I | MUBFX | 0.89% | MLRSX | 0.62% | 43.55% | $ 10,219,330 | $ 21,002 |
| Mainstay High Yield A | MHCAX | 1.03% | MHYIX | 0.78% | 32.05% | $ 7,869,022 | $ 28,308 |
| PIMCO Real Return | PRTNX | 0.94% | PRRIX | 0.57% | 64.91% | $ 20,066,108 | $ 72,826 |
| PIMCO Total Return | PTTAX | 0.85% | PTTRX | 0.46% | 84.78% | $ 6,871,743 | $ 26,800 |
| MFS Value Fund R4 | MEIJX | 0.60% | MEIKX | 0.50% | 20.00% | $ 10,580,318 | $ 9,598 |
| Oppenheimer Developing Markets Fund Y | ODVYX | 1.07% | ODVIX | 0.88% | 21.59% | $ 5,026,194 | $ 9,377 |
| Mainstay S&P 500 Index Fund A | MSXAX | 0.59% | MSPIX | 0.35% | 68.57% | $ 101,201,703 | $ 241,212 |
| Growth Fund of America R3 | RGACX | 0.98% | RGAGX | 0.34% | 188.24% | $ 12,805,233 | $ 81,953 |
| Mainstay ICAP Select Equity I | ICSLX | 0.90% | ICSDX | 0.82% | 9.76% | $ 15,572,262 | $ 10,077 |
| Royce - Low Priced Stock Fund (Serv) | RYLPX | 1.51% | RLPIX | 1.19% | 26.89% | $ 1,566,986 | $ 5,014 |
| JPMorgan Mid Cap Value Fund A | JAMCX | 1.24% | FLMVX | 0.75% | 65.33% | $ 43,791,946 | $ 214,581 |
| American Funds EuroPacific Growth Fund R3 | RERCX | 1.14% | RERGX | 0.50% | 128.00% | $ 36,536,812 | $ 234,318 |
| Mainstay Large Cap Growth R2 | MLRTX | 1.11% | MLAIX | 0.67% | 65.67% | $ 55,793,471 | $ 250,492 |
| Loomis Core Plus Bond Fund A | NEFRX | 0.78% | NERYX | 0.46% | 69.57% | $ 12,162,277 | $ 39,824 |
| Eaton Vance Income Fund of Boston I | EIBIX | 0.75% | EIBRX | 0.67% | 11.94% | $ 12,453,068 | $ 10,102 |
| Vanguard Mid-Cap Index Fund Admiral | VIMAX | 0.06% | VMCPX | 0.04% | 50.00% | $ 4,145,800 | $ 903 |
| Vanguard Small-Cap Index Fund Admiral | VSMAX | 0.06% | VSCPX | 0.04% | 50.00% | $ 3,810,989 | $ 830 |
| T.Rowe Price Target Date Funds | | 0.68% | | 0.54% | 25.93% | $ 50,473,727 | $ 51,344 |
| Total | | | | | | | $ 1,786,365 |

The manner in which the money was wasted on fees is explained in the following examples.

## JPMorgan Mid Cap Value Fund Class A (Example)

103.    In 2014, Daikin maintained an investment of $9.6 million in the JPMorgan Mid-Cap Value Class A Fund, which had an expense ratio of 1.25%.  This is disclosed in the JAMCX fund prospectus maintained by the U.S. Securities and Exchange Commission on its EDGAR database:

**ANNUAL FUND OPERATING EXPENSES**
**(Expenses that you pay each year as a percentage of the value of your investment)**

| Annual Fund Operating Expenses A, B, C, Select Shares JPMorgan Mid Cap Value Fund | | Class A | Class B | Class C | Select Class |
|---|---|---|---|---|---|
| Management Fees | | 0.65% | 0.65% | 0.65% | 0.65% |
| Distribution (Rule 12b-1) Fees | | 0.25% | 0.75% | 0.75% | none |
| Other Expenses | | 0.48% | 0.48% | 0.48% | 0.48% |
| Shareholder Service Fees | | 0.25% | 0.25% | 0.25% | 0.25% |
| Remainder of Other Expenses | | 0.23% | 0.23% | 0.23% | 0.23% |
| Acquired Fund Fees and Expenses | | 0.01% | 0.01% | 0.01% | 0.01% |
| Total Annual Fund Operating Expenses | | 1.39% | 1.89% | 1.89% | 1.14% |
| Fee Waivers and Expense Reimbursements | [1] | (0.14%) | (0.13%) | (0.13%) | (0.14%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | [1] | 1.25% | 1.76% | 1.76% | 1.00% |

Figure 2 (Information from Prospectus (485BPOS) of November 1, 2014 (CIK 0001037897 / S000004475) for JPMorgan Mid Cap Value Fund Class A  (JAMCX) available on EDGAR) (yellow box added to emphasize Class A).

104.    JPMorgan offered the very same fund, in Institutional Class shares, at the lower cost of 0.76%:

| Annual Fund Operating Expenses | | Institutional Shares JPMorgan Mid Cap Value Fund Institutional Class |
|---|---|---|
| Management Fees | | 0.65% |
| Distribution (Rule 12b-1) Fees | | none |
| Other Expenses | | 0.33% |
| Shareholder Service Fees | | 0.10% |
| Remainder of Other Expenses | | 0.23% |
| Acquired Fund Fees and Expenses | | 0.01% |
| Total Annual Fund Operating Expenses | | 0.99% |
| Fee Waivers and Expense Reimbursements | [1] | (0.23%) |
| Total Annual Fund Operating Expenses After Fee Waivers and Expense Reimbursements | [1] | 0.76% |

*See* prospectuses *supra*. The difference in the expense ratios, charged to the participants, of 0.49% -- 1.25% less .76% -- was wasted. See Figure 2 (red box added).  The difference in the expense ratio, as set forth in the prospectus, included, among other things, a 0.25% 12b-1 fee for which the Plan received no benefit.

105.    To be clear, there is no difference between JPMorgan Mid Cap Value Fund Class A and JPMorgan Mid Cap Value Fund Institutional Class as far as the investment – that is the fund – is concerned.  The difference is not in the fund – which is identical – but in the management fees charged to the investor, defined by the share class.

106.    An ERISA fiduciary has a duty to exercise prudence not only in monitoring the share class of a mutual fund at the time it is selected, but to monitor the share classes on an ongoing basis. This, Daikin failed to do in 2014, and in each of 2015, 2016, and, presumably, 2017, despite the fact that Daikin could easily have discovered and corrected its mistake by reading the prospectus, from any one of these years.  (See Prospectuses (485BPOS) for JPMorgan Mid Cap Value Fund Class A- CIK 0001037897 / S00000447 filed on November 1, 2014, November 1, 2015, November 1, 2016, and November 1, 2017).

107.    The following chart summarizes the fees wasted by selecting the wrong share class of the JPMorgan Mid Cap Value Fund, for each of the years during the class period:

| Fund Name | Symbol | Share Class | CIK | Series | Contract |
|---|---|---|---|---|---|
| JPMorgan Mid Cap Value Fund A | JAMCX | A | 0001037897 | S000004475 | C000012322 |
| JPMorgan Mid Cap Value Fund L | FLMVX | L | 0001037897 | S000004475 | C000012321 |

| Years | Prospectus Date | Fund Symbol | Alt. Symbol | Assets in Plan | Fund Exp. Ratio | Alt. Exp. Ratio | Exp Diff. | Fee Waste |
|---|---|---|---|---|---|---|---|---|
| 2009 | | JAMCX | FLMVX | $ 1,412,809 | 1.25% | 0.76% | 0.49% | |
| 2010 | | JAMCX | FLMVX | $ 2,089,992 | 1.25% | 0.76% | 0.49% | |
| 2011 | | JAMCX | FLMVX | | 1.25% | 0.76% | 0.49% | |
| 2012 | | JAMCX | FLMVX | | 1.25% | 0.76% | 0.49% | |
| 2013 | | JAMCX | FLMVX | | 1.25% | 0.76% | 0.49% | |
| 2014 | November 1, 2014 | JAMCX | FLMVX | $ 9,575,794 | 1.25% | 0.76% | 0.49% | $ 46,921 |
| 2015 | November 1, 2015 | JAMCX | FLMVX | $ 9,328,642 | 1.24% | 0.75% | 0.49% | $ 45,710 |
| 2016 | November 1, 2016 | JAMCX | FLMVX | $ 8,876,586 | 1.24% | 0.75% | 0.49% | $ 43,495 |
| 2017 | November 1, 2017 | JAMCX | FLMVX | $ 8,005,462 | 1.24% | 0.75% | 0.49% | $ 39,227 |
| 2018 | November 1, 2018 | JAMCX | FLMVX | $ 8,005,462 | 1.24% | 0.75% | 0.49% | $ 39,227 |
| | | | | | | | | |
| Total Waste | | | | $ 43,791,946 | | | | $ 214,581 |

108.    The total amount of fees wasted as a result of the share class violation was

$214,581 through the end of 2018.

**MainStay Large Cap Growth R2 (Example)**

109.    As set forth above, the Plan waste approximately $551,092 on MainStay funds

as a result of selecting the wrong share class through 2018. Of this amount, $250,492 was

wasted on the Mainstay Large Cap Growth Fund R2 through the end of 2018.

110.    In 2012, at the beginning of the class period, Daikin maintained an investment

of $5,071,050 in Mainstay Large Cap Growth Fund R2, symbol MLRTX mutual fund,

managed by a John Hancock affiliate which had an expense ratio of 1.29%.[11]  This is

disclosed in the MLRTX fund prospectus maintained by the U.S. Securities and Exchange

Commission on its EDGAR database:



Figure 1 (Information from Prospectus (485BPOS) of February 28, 2011 (CIK 0000787441

/ S00006905) for MainStay Large Cap Growth Fund – Class R2 (MLRTX) available on

EDGAR) (yellow box added to emphasize Class R2).

111. MainStay offered the very same fund at the lower cost of 0.88%. The

difference in the expense ratios, charged to the participants, of 0.41% – 1.29% less .88% –

was wasted. *See* Figure 2 (red box added to emphasize Class I). The difference in the

expense ratio, as set forth in the prospectus, included, among other things, a 0.25% 12b-1

fee for which the Plan received no benefit.

112. An ERISA fiduciary has a duty to exercise prudence not only in monitoring

the share class of a mutual fund at the time it is selected, but to monitor the share classes on

an ongoing basis. This, Daikin failed to do in 2012, and in each of 2013, 2014, 2015, and

2016, despite the fact that Daikin could easily have discovered and corrected its mistake by

reading the prospectus, from any one of these years. (*See* Prospectuses (485BPOS) for

MainStay Large Capital Growth Fund – CIK 000787441/Series S00006905 – Class R

(MLRTX) filed on February 28, 2012, February 28, 2013, February 28, 2014, February 28,

March 18, 2015, February 28, 2017, February 28, 2018).

113. The following chart summarizes the fees wasted by selecting the wrong share

class of the MainStay Large Cap Growth R2 Fund, for each of the years during the class

period:

| Fund Name | Symbol | Share Class | CIK | Series | Class / Contract |
|---|---|---|---|---|---|
| MainStay Large Cap Growth R2 | MLRTX | R2 | 0000787441 | S000006905 | C000018729 |
| MainStay Large Cap Growth I | MLAIX | I | 0000787441 | S000006905 | C000018727 |
| MainStay Large Cap Growth R6 | MLRSX | R6 | 0000787441 | S000006905 | C000127162 |

| Years | Prospectus Date | Fund Symbol | Alt. Symbol | Assets in Plan | Fund Exp. Ratio | Alt. Exp. Ratio | Exp Diff. | Fee Waste |
|---|---|---|---|---|---|---|---|---|
| 2009 | | MLRTX | MLAIX | | 1.35% | 0.85% | 0.50% | |
| 2010 | | MLRTX | MLAIX | | 1.35% | 0.85% | 0.50% | |
| 2011 | February 28, 2011 | MLRTX | MLAIX | $ 4,943,097 | 1.29% | 0.88% | 0.41% | |
| 2012 | February 28, 2012 | MLRTX | MLAIX | $ 5,071,050 | 1.17% | 0.82% | 0.35% | $ 17,749 |
| 2013 | February 28, 2013 | MLRTX | MLAIX | $ 6,649,509 | 1.14% | 0.79% | 0.35% | $ 23,273 |
| 2014 | February 28, 2014 | MLRTX | MLRSX | $ 7,758,840 | 1.12% | 0.62% | 0.50% | $ 38,794 |
| 2015 | February 27, 2015 | MLRTX | MLRSX | $ 8,567,267 | 1.09% | 0.62% | 0.47% | $ 40,266 |
| 2016 | February 29, 2016 | MLRTX | MLRSX | $ 7,452,955 | 1.07% | 0.60% | 0.47% | $ 35,029 |
| 2017 | February 28, 2017 | MLRTX | MLRSX | $ 10,146,925 | 1.09% | 0.62% | 0.47% | $ 47,691 |
| 2018 | February 28, 2018 | MLRTX | MLRSX | $ 10,146,925 | 1.10% | 0.63% | 0.47% | $ 47,691 |
| | Total | | | $ 55,793,471 | | | | $ 250,492 |

114.    The total amount of fees wasted, as a result of the share class violation, was

$250,492, through the end of 2018.

### Other Funds with Share Class Problems

115.    Daikin made the same mistake -- selecting a higher cost share class of the fund

when a lower cost share class of the very same fund was available – with respect to a number

of other funds. The details of the errors made with respect to each of these funds are shown

on the spreadsheets attached hereto as collective **Exhibit B**. Plaintiffs estimate that Daikin

wasted approximately $1.8 million as a result of failing to control costs in the selection of the

share classes of the mutual funds.  This amount does not include the cost of the lost

investment opportunity – the money that the portion of the investment spent on

unnecessary fees would have earned over time. The Plan did not receive any additional

investment management services or benefits for the use of the more expensive share classes.

The fees were clearly excessive relative to the services rendered because the less expensive

shares provided the very same investment management services as the more expensive

shares.

### FAILURE TO DISCLOSE

116.    In addition to selecting and monitoring, or failing to monitor, the Plan's

investment menu, Defendant also was responsible for providing information to the participants in the Plan as necessary for the participants to make selections from the Plan menu for their own individual investment portfolios.

117.   Defendant was obligated under 29 CFR 2550.404a-5 to provide information to participants on an ongoing basis regarding, among other things, investment performance, benchmarks, and fees and expenses.

118.   Daikin also had a more general obligation as a fiduciary "to deal fairly and to communicate to the [participants] all material facts the [Defendant] knows or should know in connection with the matter." Restatement (Third) of Trusts § 78.

119.   Daikin failed to deal fairly and to communicate material facts that Daikin knew or, as fiduciary to the Plan with access to professional investment advice, should have known about the Plan's menu options.

120.    Defendant knew, or should have known, but failed to disclose that the share classes of the Plan had been manipulated to generate additional revenue for the service providers to the Plan. Participants would have had information on the expense ratios of the funds, but, lacking the professional financial advice available to Daikin, would not have known that the share classes of the funds had been manipulated to their disadvantage.

121.   Similarly, Defendant knew or should have known but failed to disclose that the MainStay funds were excessively expensive and underperformed their benchmarks and lower-fee benchmark fund alternatives.  Participants, lacking the professional advice available to Daikin, would have depended on Dakin to monitor the performance of the funds compared to their benchmarks.

47

122.     Upon information and belief, the disclosures Defendant did provide to participants consisted of boilerplate disclosures furnished by the very same service providers that benefitted from the payment of the excessive fees which omitted information material to participants' investment decisions.  As a result, Defendant has and continues to waste millions of dollars of the participants' retirement savings on excessive fees and underperforming investments, losses that participants themselves cannot to address without judicial intervention, with Defendant failing even to provide information to participants upon receipt of a written demand from Plaintiffs' counsel.

## ERISA FIDUCIARY STANDARDS

123.     Named Plaintiffs restate and incorporate herein by reference the preceding allegations of this Complaint.

124.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as fiduciary of the Plan.  ERISA § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i)  providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and like aims.

29 U.S.C. § 1104(a).

125.     Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here, "the

48

assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

126.    ERISA fiduciaries that exercise any authority or control over plan assets, including the selection of share classes of plan investments, must act prudently and solely in the interest of participants in the plan.

127.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single to the interests of participants." *Chao v. USA Mining Inc.*, 2007 U.S. Dist. LEXIS 5598, *36, (E.D. Tenn. Jan. 24, 2007) (citing to *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995)); *Bierwith*, 680 F.2d at 271, 272 n.8.

128.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
>    a.    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
>    b.    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
>    c.    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy

the breach.

129.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to

enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a)

provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this
> subchapter shall be personally liable to make good to such plan any losses to
> the plan resulting from each such breach, and to restore to such plan any
> profits of such fiduciary which have been made through use of assets of the
> plan by the fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

## CLASS ACTION ALLEGATIONS

130.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of a plan to

bring an action individually on behalf of the plan to enforce a breaching fiduciary's liability

to the plan under 29 U.S.C. § 1109(a).

131.    Plaintiffs seek to certify a class action on behalf of all participants and

beneficiaries of the plan. Named Plaintiffs seek to certify and to be appointed as

representatives of the following class:

> All persons, other than Defendant, who were participants as of December 31,
> 2012 in the Daikin America, Inc. 401(k) Savings and Retirement Plan (the
> "Plan"), including (i) beneficiaries of deceased participants who, as of
> December 31, 2012, were receiving benefit payments or will be entitled to
> receive benefit payments in the future, and (ii) alternate payees under a
> Qualified Domestic Relations Order who, as of December 31, 2012, were
> receiving benefit payments or will be entitled to receive benefit payments in
> the future; and (b) all persons, other than Defendant, who have been
> participants or beneficiaries in either the Plan and had account balances in the
> Plan at any time between December 31, 2012 through the date of judgment.

> Plaintiffs are members of the Class.  Excluded from the Class are (a) any

person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of any Defendant or is or was a partner, officer, director, or controlling person of Defendant; (b) the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Defendant; (c) Plaintiffs' counsel; (d) sitting magistrates, judges and justices, and their current spouse and children; and, (e) the legal representatives, heirs, successors and assigns of any such excluded person.

132.     This action meets the requirements of *Fed. R. Civ. P.*, Rule 23 and is certifiable

as a class action for the following reasons:

    a.  While the precise number of Class Members is unknown to Plaintiffs at this time and can only be finally ascertained from books and records under the exclusive control of and maintained by Defendant and/or its agents, Plaintiffs believe after inquiry that there are hundreds of members of the Class located throughout the United States and that joinder of all members is impracticable.

    b.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took actions and omissions alleged herein as to the Plan and not as to any individual participant; thus, there are effectively no individual issues. The common questions of law and fact include, without limitation:

    (i)  who are the fiduciaries liable for the remedies provided by 29 U.S.C. § 1109 (a);

    (ii) whether the fiduciaries of the Plan discharged their duties with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use;

    (iii) whether or not the fiduciaries, prior to the time they engaged in the transactions described herein, had policies and procedures to investigate the merits of the investments and to structure the investments;

    (iv) whether or not the fiduciaries followed the policies and procedures to investigate the merits of the investments and to structure the investments prior to making such investments;

(v) whether or not the fiduciaries had policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to share prices as alleged herein;

(vi) whether or not the fiduciaries followed the policies and procedures to monitor the prudence of the investments on an ongoing and regular basis, including but not limited to share prices as alleged herein;

(vii) whether or not the fiduciaries understood and evaluated the plan fees and expenses associated with the plan's investments;

(viii) whether or not the fiduciaries discharged their duties with respect to the plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administration of the plan;

(ix) whether or not any fiduciary knowingly participated in a breach of duty by another fiduciary;

(x) whether or not any fiduciary knowingly failed to cure a breach of duty by another fiduciary;

(xi) the losses to the Plan resulting from each breach of fiduciary duty; and,

(xii) what Plan-wide equitable and other relief should the Court impose in light of Defendant's breach of duty.

c.      Named Plaintiffs claims are typical of the claims of the Class because Named Plaintiffs are or were participants in the Plan during the time-period at issue in this action and all participants in the Plan were harmed in the same manner by Defendant's misconduct. The legal theories upon which Plaintiffs are proceeding are typical as well.

d.      Named Plaintiffs are adequate representatives of the Class because they were, and in some cases still are, participants in the Plan.  Plaintiffs and all the Class Members were the subject of the same pattern and practices of equitable and statutory violations, and all sustained damages arising out of the same wrongful course of conduct.

Defendant has acted or refused to act on grounds generally applicable to the Class.  Names Plaintiffs have no interest in conflict with the Class, are committee to the vigorous representation of the Class, and have engaged experience and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans, as a practical matter, would be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.

133.   Therefore, this action should be certified as a class action under *Fed. R. Civ. P.,* Rule 23(b)(1)(A) or (B).

134.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions.  Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Named Plaintiffs are unaware of any difficulties likely to be

encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class action under *Fed. R. Civ. P.* Rule 23(b)(3), if it is not certified under Rule 23(b)(1)(A) or (B).

135.    Plaintiffs counsel, Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC; James White Firm, LLC; and, Lange Clark, P.C. will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under *Fed. R. Civ. P.* Rule 23(g).

## COUNT I

### BREACH OF DUTIES OF LOYALTY AND PRUDENCE

136.    Plaintiffs adopt by reference the allegations of paragraphs 15 to 122.

137.    This Count alleges breaches of the fiduciary duties of prudence and loyalty against the Defendant.

138.    The scope of the fiduciary duties and responsibilities of the Defendant includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. The Defendant is directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. In order to do so, the Defendant must have viable, documented behaviors and methodologies that improve the likelihood that participants' reach their retirement goals.

139.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S.Ct. at 1829.  Thus, to state a claim upon which relief can be granted, "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at  1829.

140.    Defendant failed to implement a prudent process of the selection, monitoring, and retention or, as the case may be, removal of investment options.  As a result, Defendant consistently selected and retained as Plan investment options mutual funds with the wrong share class – that is, Defendant selected a higher, more expensive share class of certain mutual funds, when a lower, less-expensive share class of the very same mutual fund was available.  Defendant also selected and failed to remove proprietary mutual funds, managed by the recordkeeper, that consistently underperformed their benchmarks and that were excessively overpriced given their performance.  In so doing, Defendant breached its duty of prudence to the Plan by not having a viable methodology that recognized the availability of share classes with lower expense ratios and the need to monitor and remove underperforming funds.  This resulted in a waste of Plan assets. Defendant therefore failed to discharge its duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and therefore in breach of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

141.    Defendant failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.  Defendant therefore breached its fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1)(B).

142.    Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.  Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

143.    Defendant also knowingly participated in the breach of other plan fiduciaries, knowing that such acts were a breach, enabled the other plan fiduciaries to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other plan fiduciaries and failed to make any reasonable effort under the circumstances to remedy the breach.  Thus, Defendant is liable for the losses caused by the breach of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II

### FAILURE TO SUPPLY REQUESTED INFORMATION

144.    Plaintiffs adopt by reference the allegations of paragraphs 15 through 122.

145.    This Count alleges violations against Daikin America, Inc. as Plan Administrator.

146.    The Plan Administrator is obligated "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or

other instruments under which the plan is established or operated." 29 U.S.C. §1024(b)(4). If

the Plan Administrator fails to provide the material requested within 30 days, the Court may

assess a penalty against it in favor of the participant in the amount of $110 a day from the

date of such failure or refusal. 29 U.S.C. §1132(c)(1); 29 U.S.C. §2575.502c-1.

147.    On July 23, 2018, Plaintiffs counsel sent letters to the Plan Administrator

requesting information under 29 U.S.C. §1024(b), including, the summary plan description,

plan documents and amendments, 408(b)(2) service provider disclosures, 404(a)(5)

disclosures, and an enrollment packet.  The request for information was directed to the Plan

Administrator, consistent with the instructions provided by Daikin to participants in the

Plan's summary plan description.

148.    The Plan Administrator provided incomplete copies of the plan and trust

document but failed to provide the other information requested.  The copy of the trust

document was incomplete in that the Plan Administrator withheld from production the

schedule identifying the Plan fiduciaries responsible for investment decisions.  The Plan

Administrator also failed to provide the information relating to the selection and monitoring

of the Plan's expenses and investment alternatives.  Upon information and belief, this

withholding of information was willful and intended to prevent the Plaintiffs from

identifying the investment fiduciaries that would ordinarily be named as defendants in an

action such as this and from gaining information, to which Plaintiffs are entitled, to further

support the allegations made in this Complaint.

149.    Based on the Plan Administrator's refusal to comply with Named Plaintiffs

requests for information, the Plan Administrator violated its statutory obligations under 29

U.S.C. §1024(b)(4).

150.    The Plan Administrator is liable for its violations of 29 U.S.C. § 1024(b)(4) as alleged in this Count.

## JURY TRIAL DEMANDED

151.    Pursuant to *Fed. R. Civ. P.* Rule 38 and the Constitution of the United States, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, demand a trial by jury.

## PRAYER FOR RELIEF

152.    For these reasons, Named Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

(A)    Order the Plan Administrator to provide the information requested and adjudge the Plan Administrator liable for its failure and refusal to fully respond to Plaintiffs' requests for information;

(B)    Find and declare that the Defendant has breached its fiduciary duties as described above;

(C)    Find and adjudge that Defendant is personally, jointly and severally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

(D)    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated, including, without limitation, lost investment opportunity;

(E)    Order Defendant to provide an accounting necessary to determine the

amounts Defendant must make good to the Plan under § 1109(a);

(F)     Surcharge against Defendant and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

(G)     Certify the Class, appoint Named Plaintiffs, Justin Brown and Telisa Lipscomb as class representatives, and appoint Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC, James White Firm, LLC, and Lange Clark, P.C. as Class Counsel;

(H)     Award to the Named Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(I)     Order the payment of interest to the extent it is allowed by law; and

(J)     Grant other equitable, legal, to the extent available, or remedial relief as the Court deems appropriate.


                                        /s/ Dennis G. Pantazis, Jr.
                                        _____
                                        Dennis G. Pantazis, Jr.
                                        Christina Malmat
                                        *Counsel for Plaintiffs*


**OF COUNSEL:**
Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
dgpjr@wigginschilds.com
cmalmat@wigginschilds.com

*pro hac vice application pending*

/s/ James H. White, IV

James H. White, IV
*Counsel for Plaintiffs*

**OF COUNSEL:**
James H. White, IV
James White Firm, LLC
Landmark Center | STE 600
2100 1st Ave North
Birmingham, Alabama 35203
(205) 383-1812
james@whitefirmllc.com

*pro hac vice application pending*

/s/ Lange Clark

Lange Clark
*Counsel for Plaintiffs*

**OF COUNSEL:**
Law Office of Lange Clark, P.C.
301 19th Street North
Suite 550
Birmingham, Alabama 35203
(205) 939-3933
langeclark@langeclark.com

*pro hac vice application pending*