UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUSTIN BROWN AND TELISA
LIPSCOMB, individually and on behalf of all
others similarly situated,

               Plaintiffs,

    -against-

DAIKIN AMERICA, INC,, *et al.*

               Defendants.

No. 1:18-cv-11091-PAC

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Dated: February 14, 2020

SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

*Attorneys for Defendants Daikin America, Inc., et al.*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  RELEVANT FACTS .............................................................................................3

    A.   The Daikin America, Inc. 401(k) Savings and Retirement Plan ............................3

    B.   During the Relevant Period, The Plan Offered Dozens of Low Cost
        Mutual Funds as Investment Options....................................................................4

    C.   Administrative Fees Incurred by the Plan Are Offset By Amounts
        Received by John Hancock from Other Sources of Compensation,
        Including From Investment Fees ...........................................................................6

    D.   Plaintiffs' Claims .................................................................................................7

III. LEGAL STANDARDS ..........................................................................................8

IV.  ARGUMENT .......................................................................................................9

    A.   Plaintiffs Lack Article III Standing to Pursue Any Claims Alleged in the
        FAC .....................................................................................................................9

        1.   Plaintiffs Cannot Challenge The Performance Or Investment Fees
            Of Funds They Never Invested In ........................................................10

        2.   Plaintiffs Have Not Alleged an Injury-in-Fact Regarding Allegedly
            Excessive Fees Incurred by Plan Participants.........................................11

        3.   Plaintiffs Have Not Alleged An Injury-In-Fact Regarding
            Defendant's Alleged Failure To Provide Documents .............................13

    B.   Plaintiffs' Claim That DAI Breached ERISA's Duty Of Loyalty Is Not
        Plausible ............................................................................................................14

    C.   Plaintiffs' Imprudent Investment Claim Is Not Plausible ...................................16

    D.   Plaintiffs' Claims Regarding Institutional Share Classes Do Not State A
        Plausible Claim for Excessive Fees ....................................................................21

V.   CONCLUSION ..................................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Bank of Am. Corp.*,
   No. 15-4285, 2016 WL 4446373 (S.D.N.Y. Aug. 23, 2016) ................................................12

*Amidax Trading Gp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011) ............................................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................................9

*ATSI Commc'ns, Inc. v. Schaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................................9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..........................................................................................................9

*Bell v. Pension Comm. of ATH Holding Co.*,
   Case No. 1:15-02062, 2018 WL 4385025 (S.D. Ind. Sept. 14, 2018) ....................................2

*Cunningham v. Cornell Univ.*,
   2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ...............................................................3, 15

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ........................................................................................................10

*Dezelan v. Voya Retirement Ins. & Annuity Co.*,
   No. 3:16-1251, 2017 WL 2909714 (D. Conn. July 6, 2017) ..............................................11

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982) ............................................................................................14

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
   No. 17-6685, 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) .........................................*passim*

*Flanigan v. General Elec. Co.*,
   242 F.3d 78 (2d Cir. 2001) ..............................................................................................17

*Fountain v. Karim*,
   838 F.3d 129 (2d Cir. 2016) ..............................................................................................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ..........................................................................................................9

61167389v.6

*Gearren v. The McGraw–Hill Cos.*,
    660 F.3d 605 (2d Cir. 2011) ..................................................................17

*George v. Kraft Foods Glob., Inc.*,
    641 F.3d 786 (7th Cir. 2011) ...............................................................11

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ............................................. 16, 19, 20, 24

*Hirsch v. Arthur Andersen & Co.*,
    72. F.3d 1085 (2d Cir. 1995) ..................................................................3

*Kendall v. Emps. Retirement Plan of Avon Prods.*,
    561 F.3d 112 (2d Cir. 2009) .................................................................10

*L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Council of Suffolk, Inc.*,
    710 F.3d 57 (2d Cir. 2013) ...................................................................11

*LaRue v. DeWolff, Boberg & Assocs.*,
    552 U.S. 248 (2008) ............................................................................11

*Loomis v. Exelon Corp.*,
    09-4081 (7th Cir. Mar. 3, 2010)...........................................................20

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ..........................................................20, 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................9

*Mahon v. Ticor Title Ins. Co.*,
    683 F.3d 59 (2d Cir. 2012) ...................................................................10

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ...................................................................8

*Papasan v. Allain*,
    478 U.S. 265 (1986) ..............................................................................9

*Patterson v. Stanley*,
    No. 16-6568, 2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ............................................*passim*

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) .................................................................20

*Sacerdote v. New York Univ.*,
    16-cv-6284 (KBF), 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ..............................*passim*

*Sacerdote v. New York Univ.*,
   328 F. Supp. 3d 273 (S.D.N.Y. 2018) ................................................................. 6, 11, 12, 15

*Schlesinger v. Reservists Comm.*,
   418 U.S. 208 (1974) ............................................................................................................9

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ....................................................................................... 9, 11, 13, 14

*St. Vincent Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*,
   712 F.3d 705 (2d Cir. 2013) ......................................................................................... 16, 17

*Subaru Distribs. Corp. v. Subaru of Am., Inc.*,
   425 F.3d 119 (2d Cir. 2005) ................................................................................................3

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..........................................................................................................13

*Taveras v. UBS AG*,
   612 F. App'x 27 (2d Cir. 2015) .................................................................................... 10, 11

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014) ...........................................................................................6, 7

*Vellali v. Yale Univ.*,
   308 F. Supp. 3d 673 (D. Conn. 2018) .................................................................................14

*Warth v. Seldin*,
   422 U.S. 490 (1975) ..........................................................................................................13

*White v. Chevron Corp.*,
   __ F. App'x __, 2018 WL 5919670 (9th Cir. Nov. 13, 2018) ..............................................18

*Wilcox v. Georgetown Univ.*,
   No. 18-422, 2019 WL 132281 (D.D.C. Jan. 8, 2019) .........................................................11

*Wilkins v. Mason Tenders Dist. Council Pension Fund*,
   445 F.3d 572 (2d Cir. 2006) ..............................................................................................16

**Statutes**

29 U.S.C. § 1001, *et seq.* ...................................................................................... *passim*

29 U.S.C. § 1024(b) ...........................................................................................................13

29 U.S.C. § 1104(a)(1)(A)...................................................................................................14

29 U.S.C. § 1104(a)(1)(B)...................................................................................................16

iv

29 U.S.C. § 1132(c) ...................................................................................................... 13

ERISA § 404(a)(1)(A) ................................................................................................... 15

**Other Authorities**

Fed. R. Civ. P. 12(b)(1) .............................................................................................. 1, 8

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 1, 9

Rule 12 ........................................................................................................................ 13

Defendant,[1] Daikin America, Inc. ("DAI"), by and through its attorneys and pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), submits this memorandum in support of its motion to dismiss the First Amended Complaint ("FAC").

## I.   <u>INTRODUCTION</u>

In requesting leave to amend, Plaintiffs effectively conceded that their original complaint was insufficient. (Dkt. No. 28.) And with good reason: between DAI's original motion to dismiss and Plaintiffs' amendment, this Court dismissed complaints containing virtually identical allegations. *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-6685, 2019 WL 4466714, at *1 (S.D.N.Y. Sept. 18, 2019) and *Patterson v. Stanley*, No. 16-6568, 2019 WL 4934834, at *1 (S.D.N.Y. Oct. 7, 2019). In both cases, the court dismissed strikingly similar breach of the fiduciary duty claims concerning 401(k) plan investment funds that allegedly underperformed where the complaints failed to identify apt comparator funds or plausibly allege the defendants used an unreasonable fund selection process. Both cases also rejected duty of loyalty claims premised solely on fund performance. The FAC has swollen to 224 paragraphs spanning 88 pages and broadly attacks DAI's administration of the Daikin America, Inc. 401(k) Savings and Retirement Plan ("Plan") under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"). Yet, the FAC fails for the same reasons as their original complaint, as affirmed by *Ferguson* and *Patterson*.

Plaintiffs allege that the "entire plan" was rendered imprudent by the inclusion of high cost funds "that paid hidden fees to parties-in-interest." In reality, the Plan offered a wide range of investment options, all at reasonable, market-based expense ratios. Nothing in ERISA required DAI to scour the market for the lowest-cost, highest-return options; DAI was merely required to

---

[1] Besides purportedly addressing defects in their initial pleading, Plaintiffs ostensibly have added several individual defendants. To DAI's knowledge, none of these individuals has been served.

offer a reasonable array of options with which Plan participants could construct their own investment portfolios. Further, fiduciaries satisfy their duties when they engage in a reasonable and diligent process to evaluate, select, and monitor 401(k) plan investments. The FAC is devoid of non-speculative allegations regarding the Plan fiduciaries' process. Instead, Plaintiffs rely on inapt comparisons between active and passive funds and between retail and institutional share classes and assume that anyone selecting either retail share classes or active funds must have been imprudent. Plaintiffs ignore that the use of retail shares is permissible and may provide benefits over institutional shares. Plaintiffs also disregard that the Plan operates under a "bundled" fee arrangement, where the Plan pays administrative expenses and investment management expenses from the expense ratios. Moving to institutional share classes would have required the Plan to incur separate administrative fees. *See, e.g.*, *Bell v. Pension Comm. of ATH Holding Co.,* Case No. 1:15-02062, 2018 WL 4385025, at *4-5 (S.D. Ind. Sept. 14, 2018) (describing differences between revenue sharing fee arrangements and flat fee arrangements). Plaintiffs do not account for this, rendering their claims implausible. Further, Plaintiffs do not account for the material differences between active and passive funds. For Plaintiffs' claims to rise above the level of speculation, they would have had to allege facts showing that, if the Plan moved to an all-institutional share lineup, the total cost to participants would have been lower.

Plaintiffs focus their attacks on six funds managed by affiliates of the Plan's recordkeeper John Hancock, which they allege were "poor performers." Initially, Plaintiffs lack standing to challenge four of these funds, because they never invested in them. Plaintiffs also fail to allege any facts to plausibly show that the six funds were poor performers or that the fiduciaries selected the funds at issue for the purpose of benefiting themselves or John Hancock.

At best, the FAC represents a broadside attack on the Plan fees, asserting that the Plan

could have paid less for investments and administrative services. Not only do Plaintiffs lack standing to bring their claims, but Plaintiffs' theories also are not supported by law, and reflect an improper hindsight attack on Plan performance and fees that, if allowed to proceed, would require plan administrators to scour the market for the best-performing, cheapest funds on an annual basis. The law simply does not require this. The Court should dismiss the FAC.

## II.   RELEVANT FACTS

### A.   The Daikin America, Inc. 401(k) Savings and Retirement Plan

The Plan is a defined contribution employee pension benefit plan that provides a retirement savings opportunity to eligible employees of DAI and certain affiliates. (FAC at ¶¶ 2, 5.) DAI engaged John Hancock Trust Company, LLC to act as trustee for the Plan. (*Id.* at ¶ 6.)

Participants may defer up to 80% of their compensation to the Plan, up to the Internal Revenue Code limit. (*See* Exhibit 1, Daikin America, Inc. 401(k) Savings & Retirement Plan, at pp. 12-13[2]; *see also* Exhibit 2, Summary Plan Description, Daikin America, Inc. 401(k) Savings & Retirement Plan, Updated as of September 1, 2019, at p. 1-3.) New employees are automatically enrolled in the Plan with a pre-tax contribution rate of 6% of compensation. (*Id.*) The Plan also provides a generous employer matching contribution of 50% of the first 6% of the participant's deferred compensation. (*Id.* at p. 6.) The Plan provides for an additional employer contribution

---

[2] In deciding this motion, the Court "may consider all papers and exhibits appended to the complaint, as well as any matter of which judicial notice may be taken." *Hirsch v. Arthur Andersen & Co*., 72. F.3d 1085, 1092 (2d Cir. 1995). "[D]ocuments upon which the complaint relies and which are integral to the complaint" are also appropriate for consideration. *Subaru Distribs. Corp. v. Subaru of Am., Inc*., 425 F.3d 119, 122 (2d Cir. 2005). The documents DAI references--including plan documents, summary plan descriptions, and fee notices to both participants and fiduciaries --are integral to the complaint or otherwise proper subjects of judicial notice. Plaintiffs repeatedly reference the plan documents and the expense ratios and returns documented in participant disclosures. As discussed below, the fee arrangement memorialized in the fiduciary fee disclosures is integral to comparing the investment options at issue. *See, e.g., Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *3-4 (S.D.N.Y. Sept. 29, 2017) (taking judicial notice of plan disclosures). Finally, investment prospectuses and Form 5500s are subject to judicial notice because courts routinely "take notice of publicly available documents including regulatory filings." *Id.* at *3 (citing cases). The Court may consider all of these documents in deciding this motion.

from DAI, referred to as the "retirement contribution," which is based on an employee's age and years of service. (*Id.*; *see also* Ex. 2 at pp. 10-11.)

  **B.** **During the Relevant Period, The Plan Offered Dozens of Low Cost Mutual Funds as Investment Options**

  During the relevant period, the Plan offered dozens of investment options to participants. (FAC ¶¶ 24, 50.) The Plan's investment fiduciaries employed robust review and approval procedures for selecting, monitoring, and removing investment options. From 2012 to the present, that process yielded numerous changes to the investment menu, and the Plan offered a wide range of investment options, covering major asset classes (domestic equity, bonds, international equities, balanced investments, and a stable value fund), and offering both actively and passively managed funds.

  The following chart summarizes the options over time. (*See generally* Exhibits 3-10, Plan Disclosure Statements 2012-2019.) In bold and italics are funds Plaintiffs specifically challenge, in yellow are funds in which the two Plaintiffs invested. An "X" indicates that the investment was offered during a given year:

| Investment | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Expense Ratio Range |
|---|---|---|---|---|---|---|---|---|---|
| Stable Value Option | X | X | X | X | X | X | X | X | 0.45-0.65% |
| Loomis Sayles Core Plus Bond Fund Class A | X | X | X | X | X | | | | 0.74-0.87% |
| *MainStay High Yield Corporate Bond Class A* | X | X | X | X | | | | | 0.99-1.01% |
| PIMCO Real Return Class A | X | X | X | X | X | | | | 0.87-0.98% |
| PIMCO Total Return Class A | X | X | X | | | | | | 0.85% |
| BlackRock Target Date Funds | X | | | | | | | | Various |
| Cohen & Steers Realty Shares | X | X | X | X | X | X | X | X | 0.94-1.03% |
| *Mainstay Balanced Fund Class I* | X | X | X | X | X | X | X | | 0.89-0.96% |
| *MainStay S&P 500 Index Fund Class A* | X | X | X | X | | | | | 0.62-0.69% |

| Investment | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Expense Ratio Range |
|---|---|---|---|---|---|---|---|---|---|
| JPMorgan Mid Cap Value Fund Class A | X | X | X | X | X | X | | | 1.39-1.42% |
| *MainStay ICAP Equity Select Class I* | X | X | X | X | X | | | | 0.96-1.00% |
| *MainStay Large Cap Growth R2* | X | X | X | X | X | X | X | | 1.09-1.17% |
| *MainStay MAP Fund Class I* | X | X | X | X | X | | | | 0.86-0.89% |
| Neuberger Berman Mid Capital Growth Class A | X | X | X | X | X | X | | | 1.12-1.20% |
| Royce Low-Priced Stock Fund Service Class | X | | | | | | | | 1.58% |
| American Funds EuroPacific Growth Fund Class R3 | X | X | X | X | X | X | X | X | 1.13-1.14% |
| Harbor International Fund Investor Class | X | X | X | X | X | X | | | 1.13-1.17% |
| Oppenheimer Developing Markets Class A | X | X | X | X | X | | | | 1.30-1.36% |
| T. Rowe Price Target Date Funds Advisor Class | | X | X | X | X | X | X | X | Various |
| T. Rowe Price Small-Cap Stock Advisor Class | | X | X | X | X | X | X | X | 1.15-1.21% |
| Dodge & Cox Income Fund | | | | X | X | X | X | X | 0.43-0.45% |
| MainStay S&P 500 Index Fund Class I | | | | | X | X | X | X | 0.27-0.35% |
| Eaton Vance Income Fund of Boston Class I | | | | | X | X | X | X | 0.74-0.75% |
| Loomis Sayles Core Plus Bond Fund Class Y | | | | | X | X | X | | 0.48% |
| PIMCO Real Return Administrative Class | | | | | X | X | X | | 0.89-1.23% |
| Oppenheimer (now Invesco Oppenheimer) Developing Markets Fund Y | | | | | X | X | X | | 1.07%-1.01% |
| Vanguard Small-Cap Index Fund Admiral Class | | | | | X | X | X | | 0.05-0.06% |
| Vanguard Mid-Cap Index Fund Admiral Class | | | | | X | X | X | | 0.05-0.06% |
| Oppenheimer (now Invesco Oppenheimer) Main Street Fund Class I | | | | | X | X | X | | 0.48%-0.50% |
| MFS Value Fund Class R4 | | | | | X | X | X | | 0.58-0.61% |
| Oakmark International Fund Advisor Class | | | | | | X | X | | 0.86%-0.88% |
| Neuberger Berman Mid Capital Growth Trust Class | | | | | | X | X | | 0.96%-0.98% |
| JPMorgan Mid Cap Value Fund Class R4 | | | | | | X | X | | 0.99%-1.11% |
| American Funds - American Balanced Fund Class R4 | | | | | | | X | | 0.63% |

| Investment | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Expense Ratio Range |
|---|---|---|---|---|---|---|---|---|---|
| American Funds - The Growth Fund of America Class R3 | | | | | | | | X | 0.98% |

### C.      Administrative Fees Incurred by the Plan Are Offset By Amounts Received by John Hancock from Other Sources of Compensation, Including From Investment Fees

In addition to the investment expenses incurred for holding a particular investment, the Plan incurs expenses for administrative services (recordkeeping, trustee services, investment advice, and participant education). (*See* Exhibit 11, DOL 408(b)(2) Plan Sponsor Fee Disclosure Summary Document for Retirement Plan Services provided by John Hancock Retirement Plan Services, LLC (describing direct compensation paid to John Hancock Retirement Plan Services).) A key aspect of the Plan's operation is that the Plan's administrative fees are paid from amounts received by John Hancock from other enumerated income sources. This type of revenue sharing is common among defined contribution benefit plans. *See, e.g., Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 288 (S.D.N.Y. 2018) ("In a revenue sharing arrangement, a portion of investment earnings are used to pay the fund's expenses."); *see also Tussey v. ABB, Inc.,* 746 F.3d 327, 331 (8th Cir. 2014) (noting that revenue sharing "is a common method of compensation whereby the mutual funds on a defined contribution plan pay a portion of investor fees to a third party").

Significantly, the fee for "core recordkeeping and administrative services [] is typically waived, in whole or in part, to the extent it is offset by indirect compensation received by [John Hancock] from plan investment providers." (Ex. 11 at p. 3.) The statutorily required disclosures provided by John Hancock sets forth the various channels of indirect compensation to John Hancock. (*Id.* at p. 4.) These include "compensation from the relevant investment issuer, manager, or underwriter . . . for shareholder servicing, account administration, and/or distribution services provided on behalf of the investment issuer, manager, or underwriter." (*Id.*) This means that a portion of the expense ratio summarized above and "described in the applicable fund prospectus,

insurance contracts, or similar offering disclosure materials" is used to pay for the designated administrative services. (*Id.*) In other words, the revenue sharing between fund investment managers and John Hancock reduces administrative fees that would otherwise be borne by the Plan in addition to any expense ratio charged by the fund. Such revenue sharing arrangements are common within the industry, *see, e.g., Tussey*, 746 F.3d at 331, and are disclosed to Plan participants in required annual fee disclosures the Plan provides to them: "Service providers may offset the fees they would otherwise charge with revenue sharing payments that the service provider receives in connection with plan investment options." (Ex. 9 at p. 7.)

### D. Plaintiffs' Claims

Although the FAC mentions virtually every investment offered by the Plan, Plaintiffs only make specific allegations about the fees and performance of certain funds. In Paragraphs 73 to 134, they attack the performance of five MainStay funds managed by John Hancock: (1) MainStay S&P 500 Index Fund, (2) MainStay ICAP Select Equity Fund I, (3) MainStay Large Cap Growth Fund R2, (4) MainStay MAP Fund I, (5) MainStay Balanced Fund I. (FAC at ¶¶ 73-134.) Of these funds, Plaintiffs themselves invested only in two -- the MainStay S&P 500 Index Fund and the MainStay Large Cap Growth Fund. (*Id.* at ¶¶ 7-8.) At best, Plaintiffs' "underperformance" allegations amount to claims of excessive fees, and even those are exaggerated by comparing fund performance to the returns of uninvestable indices that do not reflect the cost of investing, to the point of rendering the claim speculative. Further, as discussed below, Plaintiffs' repeated comparison to institutional class funds (and of index funds to actively management funds) are inapt. They fail to account for differences in investment style and for the fact that under the Plan's bundled fee arrangement, a portion of the investment fee went to cover administrative costs.

The focus of Plaintiffs' FAC is their attack on the inclusion of retail share class funds in the Plan. (*Id.* at ¶¶ 135-160.) Plaintiffs allege that 36 investment options were offered as retail

shares, but could have been offered with a lower expense ratio. (*Id.* at ¶ 147). To support this claim, Plaintiffs list the comparator that they claim should have been selected over the options actually offered and they assert the Plan "wasted" fees equal to the difference in expense ratios. (*Id.*)

Count II contends that DAI failed to provide certain Plan documents upon a request made by Plaintiffs' counsel, including summary plan descriptions, plan documents and amendments, fee disclosure statements, and an enrollment package. (*Id.* at ¶¶ 179-185.) Plaintiffs claim that, in response, they received incomplete copies of the Plan document and trust agreement, but nothing further. (*Id.*) They contend that this violates DAI's statutory obligations. (*Id.*) While ERISA requires the provision of certain documents to plan participants, Article III still requires Plaintiffs to plead a concrete, individualized harm suffered due to a statutory violation in order to have standing to sue in federal court. Plaintiffs fail to allege any concrete harm that they have suffered from this purported violation. They suggests that the alleged failure to provide documents somehow impaired their ability to prosecute this case, but that harm is illusory -- Plaintiffs were able to file suit despite the alleged lack of documents.

## III.   LEGAL STANDARDS

Fed. R. Civ. P. 12(b)(1) requires the Court to dismiss an action when it lacks subject-matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction under [Fed. R. Civ. P.] 12(b)(1) when the district court lacks the [] constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (citation omitted). The Court "may resolve disputed jurisdiction fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Id.* (citation omitted).

Under Fed. R. Civ. P. 12(b)(6), the Court should dismiss the FAC if Plaintiffs have not alleged "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must allege "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Rather, the Court must "accept all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *ATSI Commc'ns, Inc. v. Schaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007). But, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## IV.   **ARGUMENT**

### A.   **Plaintiffs Lack Article III Standing to Pursue Any Claims Alleged in the FAC**

To have Article III standing, a plaintiff must demonstrate, at the outset of litigation, that: (1) he or she has "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs*., 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). While these three elements are "the irreducible constitutional minimum," injury-in-fact--a concrete and particularized harm--is the "indispensable element of a dispute" that "adds the essential dimension of specificity to the dispute by requiring that the complaining party have suffered a particular injury caused by the action." *Schlesinger v. Reservists Comm*., 418 U.S. 208, 220-21 (1974). At the pleading stage, "the plaintiff must clearly [] allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see also Lujan,* 504 U.S. at 561 ("The party

invoking federal jurisdiction bears the burden of establishing the[ ] elements" of Article III standing.); *Amidax Trading Gp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (same). Critically, Plaintiffs bear this burden to "demonstrate standing for each claim [they] seek [] to press." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006)).

### 1. Plaintiffs Cannot Challenge The Performance Or Investment Fees Of Funds They Never Invested In

One of the key defects in Plaintiffs' original complaint was their failure to allege that they had invested in ***any*** of the allegedly offending funds. Plaintiffs now allege that they have invested in a total of six of the Plan's 35 investment options during the proposed class period. (FAC at ¶¶ 7-8.) Of the funds singled out in the FAC for meaningful discussion (*id.* at 76), Plaintiffs invested in only two: the MainStay S&P 500 Index Fund Class A (both Plaintiffs) and the MainStay Large Cap Growth R2 (Plaintiff Lipscomb). (*Id.*) Plaintiffs do not have standing to pursue any claims regarding the remaining funds offered in the Plan, in which they never invested. The FAC should be dismissed as to the MainStay ICAP Select Equity Fund I (*id.* at ¶¶ 94-106); MainStay MAP Fund I (*id.* at ¶¶ 107-114); MainStay Balanced Fund I (*id.* at ¶¶ 125-134) and the MainStay High Yield Corporate Bond Fund A[3] and any other fund in which Plaintiffs did not invest. *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015) (no standing because "[i]t was possible that the [plan] lost value while Taveras's individual account did not" given that plaintiff had invested in the offending fund after the relevant time period) (*citing Kendall v. Emps. Retirement Plan of Avon Prods.*, 561 F.3d 112, 119 (2d Cir. 2009)); *Patterson v. Stanley*, No. 16-6568, 2019 WL 4934834, at *1 (S.D.N.Y. Oct. 7, 2019) (no standing to sue

---

[3] There are no specific allegations in the FAC related to the MainStay High Yield Corporate Bond Fund A, rendering any challenge to it wholly speculative. To the extent the FAC can be read as challenging that fund, however, DAI moves for dismissal of that claim as well.

for breach of fiduciary duty based on funds in which the named plaintiffs had not invested); *Dezelan v. Voya Retirement Ins. & Annuity Co.*, No. 3:16-1251, 2017 WL 2909714 at *6 (D. Conn. July 6, 2017) (dismissing plaintiff's ERISA claims for lack of standing because she did not invest in the options she claimed were unlawful); *Wilcox v. Georgetown Univ.*, No. 18-422, 2019 WL 132281 (D.D.C. Jan. 8, 2019) ("[F]or either Plaintiff to have standing to sue about their defined contribution Plan, he must show fiduciary breaches that impair his individual account's value.").[4]

### 2.   Plaintiffs Have Not Alleged an Injury-in-Fact Regarding Allegedly Excessive Fees Incurred by Plan Participants

Plaintiffs also lack standing to bring any claim related to excessive fees because they do not account for all expenses incurred for a given investment option. Plaintiffs must show that "demonstrated imprudence in fact 'resulted in monetary loss.'" *Sacerdote*, 328 F. Supp. 3d at 286 (*quoting George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 797 (7th Cir. 2011)). The FAC fails to show **any** loss. Plaintiffs continue to contend that the Plan should have included institutional share classes of various funds instead of retail classes and that if it had, the fees would have been lower. (FAC at ¶¶ 135-160.) But Plaintiffs ignore that institutional share classes do not necessarily result in lower expenses in a Plan that uses a bundled fee arrangement. Moving to institutional shares may not result in a change in overall cost to the plan because reducing investment expenses will simply increase or add other charges for administrative services.

---

[4] DAI expects Plaintiffs to rely heavily on *L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Council of Suffolk, Inc.*, 710 F.3d 57 (2d Cir. 2013), as they did in their brief in response to DAI's original motion to dismiss. There, the plaintiffs sued for breaches of fiduciary duty that caused the plan to lose funding, rendering it unable to repay a judgment obtained by the plaintiffs in a prior suit and unable to pay insurance benefit claims. *Id.* at 61-63. Here, Plaintiffs identify no truly plan-wide harm -- at most, investors in the allegedly overpriced and underperforming options suffered harm. Finally, and most importantly, *L.I. Head Start* was decided before *Spokeo* and its cursory footnote discussion of the Article III issue cannot be squared with that decision. In contrast, *Taveras* is in keeping with *Spokeo*. Further, there is no plan-wide injury here because the Plan is a defined contribution plan. Losses from mismanagement affect only those participants whose accounts were invested in the imprudent or unreasonably costly funds. *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248 (2008) (discussing how plan losses manifest as individual injuries in a defined contribution plan).

11

Because they do not address the combined effect of administrative and investment fees, Plaintiffs offer only speculation that their total fees would have been any lower. (*Id.*) Their charts and assertions of "wasted" fees are misleading and incomplete because they do not address administrative fees, which would be typical and expected. Under the Plan's current structure, those administrative fees are paid from investment fees pursuant to revenue sharing arrangements. (*See*, *e.g.*, Ex. 9 ("The plan may pay service providers for administrative services rendered during the year, such as a recordkeeping and investment advisory services. Service providers may offset the fees they would otherwise charge with revenue sharing payments that the service provider receives in connection with plan investment options, otherwise their service fees may be paid from a segregated account under the plan and/or may be charged against participants' or beneficiaries' accounts. . . ."); *see also* Ex. 11 at p. 3 (describing administrative expenses paid to John Hancock, including offset to fees from revenue sharing and other indirect compensation).)

Given how the Plan functions, Plaintiffs cannot merely say that certain funds' expense ratios were higher, which in turn constitutes an injury. *Allen v. Bank of Am. Corp.*, No. 15-4285, 2016 WL 4446373 at *5 (S.D.N.Y. Aug. 23, 2016) (rejecting as improper conclusions similar generic allegations of individual harm). Rather, they would need to plausibly allege that the Plan (and the Plaintiffs individually) would have paid less in fees under an unbundled arrangement by comparing the cost of fees under such an arrangement (*i.e.*, lower investment fees plus separate administrative fees) to the fees they actually paid. Plaintiffs fail to make this showing, rendering their assertions of injury wholly speculative.[5]

---

[5] Plaintiffs' allegations regarding administrative expenses *vis a vis* the number of participants (FAC ¶¶ 161-70) are premised on the speculative assumption that an investment provider would offer services at no charge and do not cure this pleading defect. As was the case with their original complaint, the FAC does not break out administrative expenses from recordkeeping expenses (again, those expenses are bundled in the Plan).

### 3. Plaintiffs Have Not Alleged An Injury-In-Fact Regarding Defendant's Alleged Failure To Provide Documents

Plaintiffs claim that the Plan Administrator failed to provide various documents related to the Plan in violation of 29 U.S.C. § 1024(b). (FAC ¶¶ 179-185.) Even presuming for purposes of a Rule 12 motion that the Plan Administrator did not make the required response to Plaintiff's request for documents, Plaintiffs fail to allege that they have suffered from any injury-in-fact from that alleged failure.

ERISA permits an award of civil penalties for failure to provide certain required documents. 29 U.S.C. § 1132(c). Nonetheless, "injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Even after Congress has authorized a suit, "Article III's requirement remains[, and] the plaintiff must allege a distinct and palpable injury *to himself*." *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (emphasis added). To establish an injury-in-fact, a plaintiff must show that he suffered "an invasion of a legally protected interested that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quotation marks and citation omitted). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id.* (citation omitted). To that end, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496 (Kennedy, J. concurring). While Congress has the power to "identify [] and elevat[e] intangible harms," this "does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549. Article III standing still "requires a concrete injury even in the context of a statutory violation" and "a bare procedural violation, divorced from any concrete harm" is insufficient. *Id.*

The FAC fails to identify any harm the purported failure to provide documents has caused Plaintiffs. (FAC at ¶¶ 179-185.) As such, Plaintiffs have at best identified only a bare procedural violation and have failed to identify any concrete harm. This claim fails accordingly. *Spokeo*, 136 S. Ct. at 1549. Plaintiffs' suggestion of harm due to delay of this litigation is illusory at best, as they clearly were not thwarted in their ability to file suit. Indeed, the original complaint and documents incorporated by reference thereto make clear that Plaintiffs possessed everything they needed to know to file suit--the amount in fees that they were paying.

**B.      Plaintiffs' Claim That DAI Breached ERISA's Duty Of Loyalty Is Not Plausible**

ERISA's duty of loyalty requires a plan fiduciary to "discharge his duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: . . . (ii) defraying reasonable expenses of administering the plan . . . ." 29 U.S.C. § 1104(a)(1)(A). "[A] theory of breach based on incidental benefit, without more, cannot support a breach of loyalty claim." *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 688 (D. Conn. 2018) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). Accordingly, to survive a motion to dismiss a loyalty-based claim, "a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts." *Sacerdote v. New York Univ.*, 16-cv-6284 (KBF), 2017 WL 3701482, at *5 (S.D.N.Y. Aug. 25, 2017). It is not enough to make conclusory assertions "that a defendant failed to act for the exclusive purpose of providing benefits to participants and defraying reasonable administration expenses." *Id.* Rather, "a plaintiff must allege plausible facts supporting an inference that the defendant acted *for the purpose* of providing benefits to itself or someone else." *Id.* (emphasis added). Actions taken by fiduciaries that incidentally benefit a third party do not support a plausible claim for breach of the duty of loyalty. *Id.* at *6 ("If the Court were to allow mere allegations that defendant's conduct 'advanced the financial interests' of a third party to state

a claim under ERISA § 404(a)(1)(A), then the duties of loyalty and prudence would collapse into a single claim."); *see also Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (dismissing breach of loyalty claim where allegations supported only that the actions taken would have an incidental benefit to a third party).

Plaintiffs have not alleged that DAI engaged in any improper dealing with John Hancock or its affiliates with respect to offering the allegedly offending MainStay funds. Plaintiffs' FAC still is devoid of any allegations that DAI acted ***for the purpose*** of benefiting John Hancock. *Sacerdote*, 2017 WL 3701482, at *5-6. Indeed, if DAI acted for the purpose of benefiting John Hancock, then it certainly would not have removed five of the six MainStay funds that were offered by the Plan. (*See generally* Exs. 3-10.) Rather, the relationship Plaintiffs take issue with precisely mirrors that in *Sacerdote*. There, plaintiffs alleged that the fiduciary allowed two fund managers to include their own proprietary investments in the plan's menu without considering potential conflicts of interest. *Id.* at *6. Plaintiffs make nearly identical allegations, claiming that John Hancock was permitted to include its funds in the Plan's investment menu without DAI considering any potential conflict of interest. (FAC at ¶¶ 73-75.) The FAC does not allege that DAI acted purposefully to benefit John Hancock or that DAI benefitted from including the MainStay funds. *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-6685, 2019 WL 4466714, at *4 (S.D.N.Y. Sept. 18, 2019) (dismissing duty of loyalty claim that "[rode] the coattails of Plaintiffs' duty-of-prudence allegations…."); *Patterson v. Stanley*, No. 16-6568, 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019) (dismissing duty of loyalty claim that "overlap[ed] with [plaintiffs'] failed duty of prudence claims.").

## C.      Plaintiffs' Imprudent Investment Claim Is Not Plausible

Plaintiffs contend that offering certain MainStay funds violated DAI's duty of prudence.[6] ERISA requires fiduciaries to "act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). In determining whether a fiduciary has satisfied this requirement, the Court evaluates whether the fiduciary, at the time it engaged in the challenged transactions, "employed the appropriate methods to investigate the merits of the investment and to structure the investment." *St. Vincent Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 721 (2d Cir. 2013) (citation omitted). Importantly, those investment decisions are not to be evaluated "from the vantage point of hindsight" and the Court cannot rely on after-the-fact decreases in asset prices to support a breach. *Id.* at 716.

In short, ERISA's "fiduciary duty of care . . . requires prudence, not prescience." *Id.* Accordingly, on a motion to dismiss, it is not sufficient "to show that better investment opportunities were available at the time of the relevant decisions." *Id.* at 718. "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *Id.* (quoting *Hecker v. Deere & Co.,* 556 F.3d 575, 586 (7th Cir. 2009)). Nor is there any duty "to take any particular course of action if another approach seems preferable." *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 579 (2d Cir. 2006).

Despite the fact that Plaintiffs have stated that the five MainStay funds have "underperformed," nothing Plaintiffs allege shows that the Plan Fiduciaries engaged in an

---

[6] It is unclear from the FAC when Plaintiffs believe each of these investments became imprudent. Further, while they make several allegations that could encompass other funds (*see, e.g.*, FAC at ¶ 211), they only specifically discuss five of the Mainstay funds. To the extent they challenge other funds, they plead no facts to plausibly do so, and any claim that could be based on the offering of other funds should be dismissed for that failure alone.

insufficient process to select or monitor these funds. (FAC at ¶¶ 78-159.) While Plaintiffs include many more allegations in the FAC, the lion's share of the new allegations are not related to the allegedly offending MainStay funds. Instead, Plaintiffs continue to rely almost entirely on the comparison of the MainStay funds to other investment options with the benefit of hindsight. As noted, however, the Court's inquiry focuses on the investment process, not the outcome. *See, e.g., Flanigan v. General Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001) (quotations omitted). "[T]he decline in the price of a security does not, by itself, give rise to a plausible inference that the security is no longer a good investment." *St. Vincent*, 712 F.3d at 721; *see also Gearren v. The McGraw–Hill Cos.*, 660 F.3d 605, 610 (2d Cir. 2011) (noting that an investment is not imprudent merely because the price "trend[s] downward significantly"). A plaintiff must plausibly allege additional facts-- aside from a decline in price--that would give rise to a reasonable inference that the fiduciary acted imprudently in offering the investment, meaning that it failed to engage in a reasonable process to select and monitor the investment. Plaintiffs make no such allegations.

Plaintiffs' specific criticisms of the challenged funds do not plausibly show the existence of an imprudent process during the class period. In contrast, they call out events that happened well before the proposed class period and point to facts suggestive of reasonable fund performance. Among their inapt assertions are that: (1) an affiliate of John Hancock was sanctioned in 2009 by regulators for actions related to some other unidentified fund (FAC at ¶ 79); (2) the death of the original manager of the MainStay ICAP Equity Fund in 2007 (five years before the start of the class period) (*id.* at ¶ 98); and (3) the removal of the MainStay ICAP fund manager in 2017 (after the fund was removed from the Plan) (*id.* at ¶ 104), and negative asset flows and management changes in 2014-17 (again covering periods when the fund was no longer a Plan investment) (*id.* at ¶¶ 98, 102-104). Plaintiffs' allegations regarding the Mainstay Map I Fund are similar, related

17

to events well before the start of the class period. (*Id.* at ¶ 108) The performance data Plaintiffs present shows at most minor cumulative performance differences between that fund and an index (which reflects no fees) and an institutional class mutual fund. (*Id.* at ¶¶ 111-12.) With respect to the MainStay Large Cap Growth fund, the FAC acknowledges that it outperformed its benchmark in three of six years covered by the class period, a fact refuting (not supporting) a claim of imprudence. (*Id.* at ¶ 120.) The allegations regarding the MainStay Balanced Fund similarly fail to show any material underperformance. (*Id.* at ¶129.) Stripped of immaterial or overstated claims regarding the management or performance of these funds, the FAC appears at most to challenge the level of investment fees for the MainStay funds, which are discussed below. (*Id.* at ¶¶ 73-134.)

The Ninth Circuit recently affirmed dismissal of a complaint under similar circumstances. *See White v. Chevron Corp.*, __ F. App'x __, 2018 WL 5919670, at *1 (9th Cir. Nov. 13, 2018). In doing so, the court noted that "the allegations showed only that [defendant] could have chosen different vehicles for investment that performed better during the relevant period, or sought lower fees for administration of the fund. None of the allegations made it more plausible than not that any breach of a fiduciary duty had occurred." *Id.*

The Southern District of New York followed suit in *Ferguson* and *Patterson*. In *Ferguson*, 2019 WL 4466714, at *8, the Court dismissed a breach of duty of prudence claim, stating "an allegation that an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA" absent any plausible allegations of an improper selection process. In *Patterson*, 2019 WL 4934834, at *10, the court concluded that "the mere fact that the Mid Cap Fund did not do as well as other options does not give rise to the inference that Defendants' decision to retain that investment offering was imprudent."

Plaintiffs' bloated pleading fails for the same reason. The FAC's allegations merely consist of comparisons to other investments that performed better or had lower expenses with the benefit of hindsight. For instance, Plaintiffs claim that the MainStay Large Cap Growth Fund R2 was imprudent because it failed to outperform its benchmark. (FAC at ¶¶ 118-119.) Plaintiffs also claim that the fund's five-year rolling alpha made it imprudent at some point. (*Id.* at ¶ 123.) These hindsight claims do not support a plausible claim for breach of fiduciary duty.

The allegations regarding imprudent selection of and alleged failure to monitor the MainStay funds are even weaker given that, of the five other challenged MainStay funds, *four were removed as investment options*. (Ex. 9.) Plaintiffs allege no facts to show that these investments became imprudent at any time before they were removed or that the fiduciaries' review and monitoring and decisionmaking process was otherwise unreasonable or inappropriate.

Plaintiffs' backup assertion that the "entire Plan was rendered imprudent" (FAC at ¶ 212) fails as well. The Plan offered an array of different investments with an acceptable range of fees. As the Seventh Court has noted:

> That fact that it is possible that some other funds might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems).

*Hecker*, 556 F.3d at 586. In *Hecker*, the plan at issue offered twenty mutual funds with expense ratios ranging from .07% to just over 1% along with a brokerage window option where participants could invest in 2,500 other mutual funds. *Id*. The Seventh Circuit affirmed dismissal of the plaintiffs' claim that the defendant violated its fiduciary duty by not offering cheaper investment options:

> Thus, even if, as plaintiffs urge, there is a fiduciary duty on the part of a company offering a plan to furnish an acceptable array of investment vehicles, no rational trier of fact could find, on the basis of the facts alleged in this Complaint, that [the defendant] failed to satisfy that duty . . . As we have noted several times already,

> the Plans here directly offered 26 investment options, including 23 retail mutual
> funds, and offered through BrokerageLink 2,500 non-Fidelity funds. We see
> nothing in the statute that requires plan fiduciaries to include any particular mix of
> investment vehicles in their plan.

*Id*. In a subsequent case, *Loomis v. Exelon Corp.,* 658 F.3d 667 (7th Cir. 2011), the Seventh Circuit again affirmed dismissal where the plan offered 24 mutual funds with expense ratios ranging from 0.03% to 0.96%. *Id.* at 669. And notably, unlike the *Hecker* plan, the plan in *Loomis* did not offer a brokerage window allowing participants to invest in other funds. Brief of Plaintiffs-Appellants at 23, *Loomis v. Exelon Corp.*, 09-4081 (7th Cir. Mar. 3, 2010). In affirming the dismissal, the court reiterated that a fiduciary need not offer the lowest-cost, highest-performing options:

> [The defendant] offered participants a menu that includes high-expense, high-risk,
> and potentially high-return funds, together with low-expense index funds that track
> the market, and low-expense, low-risk, modest-return bond funds. It has left choice
> to the people who have the most interest in the outcome, and it cannot be faulted
> for doing this.

*Loomis,* 658 F.3d at 673. The Third Circuit has set forth a similar standard for assessing breach of duty of prudence claims in the defined contribution context. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 322-23 (3d Cir. 2011) (affirming dismissal of fiduciary breach claim and finding that a plan offering 73 investment options with expense ratios ranging from 0.10% to 1.21% does not support plaintiffs' breach of fiduciary duty claim alleging that the fees on the investment options were excessive in comparison to other mutual funds and other types of investments). This Court has adopted this standard for assessing claims of imprudence at the motion to dismiss stage. *See Sacerdote*, 2017 WL 3701482, at *11 (dismissing claims for breach of duty of prudence on the basis that courts "look [] first to the characteristics of the mix and range of options and then evaluate [] the plausibility of claims challenging fund selection against the backdrop of the reasonableness of the mix and range of investment options" (quoting *Renfro*, 671 F.3d at 326)).

Hindsight is not enough to plead a plausible imprudent investment claim. If it was, then a fiduciary's duty would be to scour the market continuously for the cheapest, best performing funds possible, but this is not the law. Here, the Plan offered *at least 36* different investment options throughout the course of the Class Period.[7] (FAC at ¶¶ 73-75, 147.) By Plaintiffs' admission, these had expense ratios ranging from .06% to 1.51% and represented a wide range of assets types, including various types of fixed income funds and a variety of domestic and international equity funds. (*Id.* at ¶ 146.) This broad range of investment options precludes Plaintiffs' claims of imprudence.

**D.    Plaintiffs' Claims Regarding Institutional Share Classes Do Not State A Plausible Claim for Excessive Fees**

The core of Count I is a claim that DAI breached its fiduciary duty by offering or failing to remove retail shares of investment options in favor of institutional shares. (*Id.* at ¶¶ 206-216.) Plaintiffs' claim is again not plausible.

As set forth above, the options offered to Plan participants encompassed a wide range of asset classes, expense ratios, and risk-return profiles. Plaintiffs' challenge to the inclusion of retail shares instead of institutional shares cannot support a fiduciary breach claim with the availability of so many options. *See, e.g.*, *Sacerdote,* 2017 WL 3701482, at *11 (dismissing fiduciary breach claim alleging that institutional shares should have been offered instead of retail shares where the range of expense ratios of plan's 63 funds was reasonable); *Ferguson*, 2019 WL 4466714, at *10 ("ERISA does not require fiduciaries to include a particular mix of investment vehicles in a plan.").

Plaintiffs' apparent claim that all retail shares are inherently inappropriate fails for the additional reason that it does not account for reasons why retail shares share may be prudent and

---

[7] Plaintiffs do not challenge every investment option offered during the Class Period, but specifically cite 24 options. Plaintiffs' count is thus low, and DAI will demonstrate the full range of the investment options at the appropriate time.

reasonable as a matter of law. For instance, courts have recognized that retail shares typically provide greater liquidity to participants. *Loomis,* 658 F.3d at 672. In *Loomis*, the Seventh Circuit noted that retirees can withdraw funds daily from retail share funds, while institutional classes do not provide that benefit. *Id.* In short, "[i]t is not clear that participants would gain from lower expense ratios at the cost of lower liquidity." *Id.*

The differences between retail and institutional shares are borne out here. For instance, Plaintiffs contend that the Plan should have offered the I Share class of the Oppenheimer Developing Markets Fund, rather than either the A Shares or Y Shares. (FAC at ¶ 147.) Among other differences, the prospectus for that fund expressly states that "[m]ost of the special account features available to investors buying, selling, exchanging and transferring the Fund's other share classes do not apply to Class I shares." (Exhibit 12, Oppenheimer Prospectus, at p. 25.) In light of this, Plaintiffs must allege more than a mere difference in cost for this claim to survive. Without more, "the inclusion of retail options does not, on its own, suggest imprudence." *See, e.g.*, *Sacerdote,* 2017 WL 3701482, at *11. Since Plaintiffs have alleged nothing more, this claim is implausible. *Ferguson*, 2019 WL 4466714, at *6 ("Plaintiffs' allegations that the Plan included high-cost share classes of investment options when lower-cost share classes of those same investment options were available to the Plan do not, as a matter of law, support an inference of a flawed fiduciary process.").

Further, as discussed *supra* at IV.A.2, Plaintiffs' contentions regarding retail share classes are meritless because they do not present an apples-to-apples comparison. Plaintiffs claim that the Plan should have offered institutional share classes of many investment options. (FAC at ¶ 147.) But this allegation fails to account for the bundled fee arrangement by which the Plan paid administrative expenses in part through investment expenses. The expense ratios for investment

options offered by the Plan included administrative expenses. (*See*, *e.g.*, Ex. 9 at p. 7 ("The plan may pay service providers for administrative services rendered during the year, such as recordkeeping and investment advisory services. Service providers may offset the fees they would otherwise charge with revenue sharing payments that the service provider receives in connection with plan investment options . . . ."); *see also* Ex. 11 at p. 3 (describing administrative expenses paid to John Hancock, including offset to fees from revenue sharing and other indirect compensation).) By contrast, the institutional share classes Plaintiffs claim should have been offered did not. The Plan would have incurred additional administrative expenses on top of those referenced by Plaintiffs. Plaintiffs fail to account for a portion of fees already included in the Plan's published expense ratios; therefore, they have not alleged that they would have paid less in fees under an unbundled fee arrangement.

Beside the inapt comparison of institutional and retail share classes, Plaintiffs' excessive fee claims rest on a juxtaposition between actively managed funds and passively managed funds. Those types of investments are inherently different. Nothing in ERISA requires fiduciaries to offer one type, the other type, or, as here, both types. Simply identifying a passively managed fund that costs less than an actively managed fund is exactly the type of Monday-morning quarterbacking that does not give rise to a claim for breach of fiduciary duty. Passively managed funds will always have lower expense ratios, and thus finding for Plaintiffs on this basis would force fiduciaries to always select passively managed funds over actively managed funds. This presents two potential problems for fiduciaries and participants. First, it limits choice. Here, if a participant does not want an actively managed fund, there are passive funds available, but in Plaintiffs' alternate reality, if a participant wanted an actively managed fund, there would be no choice. Indeed, there are potential benefits for investing in an actively managed fund, namely the opportunity for greater gain than in

an index fund, and the potential for insulation from down markets.[8] Second, if performance is the key, given the sheer number of potential investment funds, there likely will always be a fund that outperforms a selection, which in turn would necessarily subject fiduciaries to lawsuits each year. The purpose of ERISA is to ***encourage*** employers to provide benefits to employees. Adoption of Plaintiffs' theory would have the opposite effect.

In sum, Plaintiffs' straight comparison of expense ratios for retail shares to institutional shares does not plausibly show that the Plan would have paid less, much less that the fees it did pay were unreasonable. Critically, Plaintiffs have failed to allege that the "administrative fees were excessive relative to the services rendered." *Ferguson*, 2019 WL 4466714, at *8; *Patterson*, 2019 WL 4934834, at *12 (conclusory allegations that the funds were similar were not sufficient to overcome facts demonstrating that the funds at issue are not meaningful comparators).

Even an apt comparison that accounted for the bundled fee arrangement utilized by the Plan would not meet Plaintiffs' burden. The expense ratios charged for the investment options offered in the Plan were those charged to the general public. (*Compare*, *e.g.*, Ex. 9 at p. 6 *with* Exhibit 13, Cohen & Steers Realty Shares, Supplement dated January 3, 2019 to Summary Prospectus and Prospectus dated May 1, 2018, at p. 1.) As in *Hecker*, "these funds were also offered to investors in the general public so expense ratios were necessarily set to attract investors in the marketplace." 556 F.3d at 581. In affirming dismissal of the plaintiffs' excessive fee claims, the court found the fees charged to be presumptively reasonable because they "were set against the backdrop of market competition." *Id.* at 586. Plaintiffs offer nothing here to plausibly show otherwise. More to the point, however, and dispositive of this issue, it is "improper for the Court

---

[8] For example, the 2019 fee disclosures reveal that all of the T. Rowe Price funds out performed their benchmark in a year marked with market volatility. As did the Cohen & Steers Realty Shares fund, the Invesco Oppenheimer Main Street Fund, the MFS Value Fund, The T. Rowe Price Small-Cap Stock Fund (Advisor Class), the American Funds - EuroPacific Growth Fund, and the Invesco Oppenheimer Developing Markets Fund. (Ex. 11.)

to micromanage fiduciary investment choices," which is exactly what Plaintiffs ask this Court to

do here. *Ferguson*, 2019 WL 4466714, at *7.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Plaintiffs' FAC in its entirety.

Dated: New York, New York
        February 14, 2020

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Anshel Joel Kaplan*

     Anshel Joel Kaplan
     620 Eighth Avenue
     New York, New York 10018-1405
     (212) 218-5500
     akaplan@seyfarth.com

     Ian H. Morrison (*pro hac vice*)
     Seyfarth Shaw LLP
     233 S. Wacker Drive, Suite 8000
     Chicago, IL 60606
     imorrison@seyfarth.com

Attorneys for Defendant
DAIKIN AMERICA, INC.

26

61167389v.6

## <u>CERTIFICATE OF SERVICE</u>

I, Anshel Joel Kaplan, an attorney, do hereby certify that I have caused a true and correct copy of the foregoing document to be filed using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record on February 14, 2020.

*<u>/s/ Anshel Joel Kaplan</u>*
Anshel Joel Kaplan

61167389v.6